NO. 19-73334

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

KARL SEURING,

Petitioner-Appellant

v.

DELTA AIRLINES, INC.,

Respondent-Appellee

On Petition for Review of the Final Decision and Order of the United States Department of Labor's Administrative Review Board
ARB Case No. 2019-0082
ALJ Case No. 018-AIR-00033

Hon. William T. Barto, Chief Administrative Appeals Judge

**EXCERPTS OF RECORD**
**(ER 1-95)**

Michael A. Cox, OSB No. 935070
Of Attorneys for Carla Pederson

LAW OFFICE OF MICHAEL A. COX
7420 S.W. Bridgeport Road, Suite 101
Tigard, Oregon 97224
(503) 443-2100

## Table of Contents


Petition for Review to Ninth Circuit …………………….……………..… ER1

Decision of Administrative Law Judge (August 23, 2019) ………………. ER2

Petition for Review to Administrative Review Board (September 5, 2019) ER52

Order of ARB re Extension (September 26, 2019) ……………..……….. ER54

Amended Petition for Review to ARB (October 10, 2019) ……………… ER57

Motion for Leave to File Amended Petition (October 10, 2019) ………….. ER86

Respondent’s Request to Dismiss the Amended Petition (October 17, 2019) ER89

Final Order of ARB Dismissing the Petition for Review (October 30, 2019) ER94

C12/3

RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

DEC 30 2019

FILED 12/30/19
DOCKETED 12/31/19 HC
DATE INITIAL

United States Court of Appeals
for the
9th CIRCUIT

| | | |
|---|---|---|
| KARL SEURING, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | 2018 AIR 00033 |
| v. | ) | |
| | ) | |
| DELTA AIRLINES, INC., | ) | |
| | ) | |
| Respondent | ) | 19-73334 |
| | ) | |

**PETITION FOR REVIEW**

Karl Seuring hereby petition the court for review of the Order of the Administrative Review Board Dismissing the Complainant's Petition for Review entered on October 30th, 2019

Date: December 23rd, 2019

K.S.

Karl Seuring
5400 Carillon Point
Kirkland, Washington 98033

**U.S. Department of Labor**

Office of Administrative Law Judges
2 Executive Campus, Suite 450
Cherry Hill, NJ 08002

(856) 486-3800
(856) 486-3806 (FAX)

**Issue Date: 23 August 2019**

Case No.: 2018-AIR-00033

In the Matter of

**KARL SEURING**
Complainant

v.

**DELTA AIRLINES, INC.**
Respondent

Appearances:

John Rearden, Jr., Esq.
Peter DeBruyne. Esq.
For the Claimant

Ellen C. Ham, Esq.
Jessica L. Asbridge, Esq.
For the Employer

Before: **SCOTT R. MORRIS**
Administrative Law Judge

## DECISION AND ORDER DENYING RELIEF

This matter arises under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), which was signed into law on April 5, 2000. *See* 49 U.S.C. § 42121. The Act includes a whistleblower protection provision, with a Department of Labor complaint procedure. Implementing regulations are at 29 C.F.R. Part 1979, published at 67 Fed. Reg. 15,453 (Apr. 1, 2002). The Decision and Order that follows is based on an analysis of the record, including items not specifically addressed the arguments of the parties, and the applicable law.

## I. PROCEDURAL BACKGROUND

Complainant filed an AIR 21 complaint with the Occupational Safety and Health Administration ("OSHA") on June 5, 2017. JX-1C. In its March 30, 2018 letter, OSHA deferred to an arbitrator's decision[1] it received that day. JX-1A. On April 26, 2018,[2]

[1] *See* JX 9.

Complainant objected to OSHA's findings and requested a formal hearing before the Office of Administrative Law Judges ("OALJ"). JX-1B.

Subsequently, on May 22, 2018, the undersigned received assignment of this matter and issued the Notice of Assignment and Conference Call. Complainant responded to the Notice of Assignment by letter dated June 1, 2018, and attached his statement, which was originally transmitted as part of his Complaint to OSHA. This Tribunal issued a Notice of Hearing and Pre-Hearing Order on June 21, 2018, which set the hearing for November 26, 2018 in the Seattle, Washington area. Thereafter, on August 13, 2018, the parties submitted a Joint Motion for Protective Order which this Tribunal approved of on August 31, 2018. On October 19, 2018 Respondent submitted a Motion to Dismiss for Discovery violations, which the Tribunal denied on November 1, 2018.

Respondent submitted its prehearing statement and proposed exhibit list on November 13, 2018. Complainant submitted prehearing materials on November 12, 2018.

This Tribunal held a hearing in this matter in Des Moines, Washington from November 26 to November 29, 2018.[3] Complainant and Respondent's representatives were present during all of these proceedings. At the hearing, this Tribunal admitted Joint Exhibits ("JX") 1 through 17;[4] Respondent's Exhibits ("RX") 1 through 14, 16 through 82, 88, 89, 91, 92, and 99 through 234;[5] and Complainant's Exhibits ("CX") 1 through 381.[6] The undersigned has based the following decision upon an analysis of the admitted evidence, the testimony of the witnesses at this hearing, and the arguments of the parties.

Complainant submitted its closing brief on February 8, 2019.[7] Respondent submitted its closing brief on March 15, 2019. Complainant submitted his reply brief on April 5, 2019.

---

[2] The parties' stipulation of fact indicates that this occurred on May 1, 2018. However, the administrative record contains a copy of Complainant's request for hearing and this is the correct day.

[3] The Transcript of the November 26 to 29, 2018 proceedings will hereafter be identified as "Tr." Both parties provided brief opening statements. Tr. at 17-55.

[4] Tr. at 8, 12.

[5] Tr. at 15, 581. During the hearing Respondent withdrew RX 15, 83-87, 90 and 93-98. Tr. at 777.

[6] Tr. at 13. CX 382 was offered but rejected. Tr. at 85. CX 383, 384 and 385 were offered for identification only as demonstrative exhibits. Tr. at 158. CX 310, CX 312, CX 324, and CX 329 were initially admitted. However, during the hearing Complainant made an offer of proof and following that offer, the Tribunal ruled that these exhibits were not going to be considered material or relevant. Tr. at 191-92.

[7] On January 10, 2019, Complainant requested a two-week extension to file his brief. The Tribunal granted his request until February 8, 2019, and in that Order it also extended the briefing due dates for Respondent's brief and Complainant's Reply brief.

## II. FACTUAL BACKGROUND AND EVIDENCE[8]

### A. Stipulated Facts

The parties stipulated to the following facts, which are copied verbatim from JX 17.

**A. Pilot Working Agreements**

1. Delta pilots are represented by a union, the Air Line Pilots Association, International ("ALPA").
2. The Pilot Working Agreement ("PWA") between Delta and ALPA signed July 1, 2012 with an amendable date of December 31, 2015 governs all events occurring between July 1, 2012 and November 31, 2016.
   a. Section 14 relates to sick leave.
   b. Section 18 relates to grievances.
   c. Section 19 relates to the System Board of Adjustment.
   d. Section 23 relates to scheduling.
3. The Pilot Working Agreement between Delta and ALPA signed December 1, 2016 with an amendable date of December 31, 2019 governs all events occurring after December 1, 2016.
   a. Section 18 relates to grievances.
   b. Section 19 relates to the System Board of Adjustment.

**B. Information Related to FACH921**

1. FACH921 is a Boeing 737-500 aircraft.
2. The Chilean Air Force is the owner/operator of FACH921.
3. FACH921 was at Delta TechOps between January 4, 2016 and March 13, 2016 for a C-check.

**C. Information related to Delta's Investigation/Complainant's Termination**

1. Complainant was interviewed by Captain Philip Davis ("Davis") on August 24, 2016. Company representatives Captain O.C. Miller ("Miller") and Jason Zawislak ("Zawislak") and an ALPA representative were present during the interview.
2. Complainant was placed on CADM[9] status on August 24, 2016.
3. While Complainant was on CADM, he was on pay status.
4. Complainant was interviewed by Davis on September 15, 2016. Company representative Captain Rip Johnson ("Johnson") and ALPA representatives

---

[8] The Tribunal has reviewed and considered each exhibit admitted into evidence. However, given the volume of documents offered and accepted at the beginning of the hearing, the Tribunal cautioned the parties that unless they referred to them in their briefs, it would assume that the parties found the exhibit to be of little or no relevance or probative value. Tr. at 7-8, 14. The Tribunal views this practice as consistent with the Board's guidance in *Austin v. BNSF Railway Co.*, ARB No. 17-024, ALJ No. 2016-FRS-13, slip op. at 2 n.3 (Mar. 11, 2019).

[9] Company Administrative Leave. Tr. at 381.

Captain Jud Crane ("Crane") and First Officer Drew Osborne ("Osborne") were present during the interview.

5. Complainant was interviewed by Davis on October 19, 2016. Company representatives Miller and Zawislak and ALPA representative Hartley Phinney were present during the interview.
6. On October 31, 2016, Davis met with Complainant to receive any further documentation requested in earlier interviews and complete any follow-up related to the prior three interviews. Company representative Johnson and ALPA representative Crane were present during this meeting.
7. On March 13, 2017, Captain James Graham ("Graham") issued the Notice of Intent to terminate Complainant.
8. On March 28, 2017, Complainant filed a grievance challenging the notice of intent to terminate.
9. On April 4, 2017, an initial hearing was held on Complainant's March 28, 2017 grievance. Present at the hearing were Complainant, ALPA representative Phinney, and Company representatives Miller and Zawislak.
10. On April 13, 2017, Graham issued the letter terminating Complainant.
11. On May 3, 2017, ALPA submitted Complainant's March 28, 2017 grievance to the five-man System Board and stated the issue as whether Respondent had just cause to terminate the Complainant.
12. The three-day arbitration hearing regarding Complainant's grievance challenging his termination was held on September 19, 20, and 21, 2017 in Atlanta, Georgia.
13. Complainant was represented by ALPA legal counsel at the hearing.
14. The arbitration hearing was held in Atlanta, Georgia.
15. The arbitrator was Carol Wittenberg. The Company board members were Mike Doyle and Lawrence Marciano. The ALPA board members were Ed Havrilla and Chris Renkel.
16. On March 16, 2018, Arbitrator Wittenberg issued the decision denying Complainant's grievance and upholding his termination.

**D. The B777 LAX CA Award**

1. Had he not been terminated from Delta, Complainant would have entered upgrade training for the B777 LAX CA position on or about August 1, 2017.
2. Had he not been terminated from Delta, Complainant would have completed training for B777 LAX CA position on or about September 11, 2017.

**E. OSHA Investigation Information**

1. On June 5, 2017, Complainant filed his AIR21 complaint with attachments with OSHA. Complainant also filed a copy of his complaint with attachments with the FAA.
2. On June 5, 2017, Complainant was interviewed by OSHA investigators Tobias Cameron and Jen Weist regarding his June 5, 2017 AIR21 Complaint.
3. On March 30, 2018, OSHA dismissed Complainant's June 5, 2017 AIR21 Complaint, deferring to the arbitration proceedings in the case.

4. On May 1, 2018, Complainant filed objections to the March 30, 2018 dismissal.

**F. Pass Travel**

1. Chok Pin Foo ("Foo") was designated as Complainant's travel companion.

2. Complainant completed a form designating Foo as his travel companion on September 4, 2005.

3. Complainant provided his pass travel log-in credentials to Foo to allow Foo to log into Delta's pass travel system directly to book travel and use his credit card to pay any fees associated with the travel.

**G. Complainant's Background**

1. Complainant Karl E. Seuring was born ______.[10]
2. Complainant Karl E. Seuring has primarily resided at [REDACTED], Redmond, WA 98052 from 1990 to the date of trial in this matter.
3. Complainant Karl E. Seuring owns a secondary residence at [REDACTED], Freeport, IL, which he purchased in 2017 for $47,000.
4. Complainant Karl E. Seuring graduated from Freeport High School in June 1982.
5. Complainant Karl E. Seuring attended Highland Community College in Freeport, Illinois, for approximately two years.
6. Complainant Karl E. Seuring was admitted to the pre-aerospace engineering course of study at Iowa State University, but did not complete a semester at Iowa State University, because he was hired by Western Airlines, Inc.
7. Complainant Karl E. Seuring has been a pilot for 40 years.
8. Complainant Karl E. Seuring received his first pilot's license as a Student (solo) in 1979.
9. Complainant Karl E. Seuring received his first pilot's license as a Commercial pilot in 1982.
10. Complainant Karl E. Seuring received training and education to become a pilot at Freeport Aviation, Inc. (Freeport, IL) from 1979 to 1982, Aero Taxi (Rockford, IL; Beech 18) 1983, SMB Stage Line, Inc. (DFW Airport, TX; Convair 600 & 640, 1984-1986, Western Airlines, Inc. (Los Angeles, CA B727) until merger with Delta Air Lines, Inc. in 1987.
11. Complainant Karl E. Seuring also received the following additional training: Glider Aero Tow - Commercial Pilot (Reno, NV), ASME, CFII & CGI ratings.
12. Complainant Karl E. Seuring was employed by Western Airlines, Inc. on September 8, 1986.
13. Complainant Karl E. Seuring held the following positions at Delta Air Lines, Inc.: B727 SO - SEA, L1011 SO - PDX, (MD-11 TNG only PDX), B727 FO – SEA and DFW, B757/767ER FO - NYC, B727 CA - NYC, B727 CA - DFW (B727 LCA - DFW & SLC), B727CA SLC, B757 CA SLC, B757/76ER CA ATL, B767-400 CA ATL, B757/76ER CA - SEA. (SO Second Officer,

[10] This information was redacted in JX 17.

FO First Officer, CA Captain, LCA Captain Line Check Airman, B727).

14. Complainant Karl E. Seuring became employed by Delta Air Lines, Inc. on April 1, 1987, as a result of a merger with Western Airlines, Inc.
15. Complainant Karl E. Seuring held the position of B727 SO – SEA, immediately after being hired by Delta Air Lines, Inc.
16. Immediately before termination of his employment on April 13, 2017, Complainant held the position of B757/767ER CA – SEA.
17. Complainant Karl E. Seuring was awarded the position of B777A LAX in December 2016.
18. Complainant Karl E. Seuring received the following additional training at Delta Air Lines, Inc.: FAR[11] 121 air carrier transition CD sent to Western Air Lines, Inc. pilots, followed by Simulator & LCA conformity.
19. Complainant Karl E. Seuring logged the following estimated flight hours: 16,500 total flight time; 11,500 pilot-in-command including single pilot; 12,500 multi-engine; 3,500 single engine and 12,500 transport category.
20. Complainant Karl E. Seuring was appointed Delta Air Lines, Inc. MEC Jump-Seat Coordinator in 1996 and Delta Air Lines, Inc. MEC Jump-Seat Committee Chairman in 1998 for Air Line Pilots Association.
21. Complainant Karl E. Seuring owns the following companies: AirSpeed Engineering, LLC, registered in Wyoming in 2012 and Delaware in 2008; The Leading Edge Group, LLC, registered in Washington in 2001, and ARC Avionics Corp., registered in Florida and acquired in 2014.
22. PATS Aircraft, LLC., Georgetown, DE, was the first owner of STC for FACH921.
23. Complainant Karl E. Seuring's first-class medical certificate expired or was converted to a second-class medical certificate November 30, 2016. A first-class medical certificate was issued to Complainant Karl E. Seuring on July 25, 2017, and renewed on February 22, 2018, and on November 6, 2018. The only restrictions for any first-class medical certificate issued to Complainant Karl E. Seuring have been restrictions requiring corrective lenses and glasses for near/intermediate vision.

**H. May 2013 Events**

1. Complainant's Schedule:
    a. Complainant was originally scheduled to be off duty on May 20, 21, and 22, 2013 and on reserve duty on May 23-28, 2013.
    b. On May 16, 2013, Complainant was awarded authorized personal drop ("APD") days of May 26-28, 2013, pursuant to Sec. 23.I.10 of the PWA.
    c. At 9:03 PDT (11:03 EDT) on May 22, 2013, Complainant was awarded rotation 8533 with a report time of 13:15 PDT on May 23, 2013.

---

[11] FAR stands for the Federal Aviation Regulations contained in 14 C.F.R. The 121 referenced in this stipulation is referring to Part 121 of the FARs.

   d. At 10:01 PDT on May 22, 2013, Complainant acknowledged the rotation 8533 assignment.

   e. At 10:28 PDT on May 22, 2013, Complainant viewed his May 2013 schedule.

2. Complainant's Sick Leave:
   a. On 18:24 PDT (21:24 EDT) on May 22, 2013, Complainant called out sick and was on sick leave until he called in well on May 25, 2014 at 11:01 PDT (13:01 CDT).

3. Dates of Travel:
   a. On May 20, 2013, Complainant flew from Hartsfield-Jackson Atlanta International Airport ("ATL") to Sea-Tac Airport ("SEA") on a Delta jumpseat, arriving at 19:50 PDT (22:50 EDT).
   b. On May 22, 2013, Complainant did not have a travel reservation (jumpseat or non-revenue) in place on Delta's systems to travel from Jorge Chavez International Airport ("LIM") to ATL (with a final destination of SEA). The last flight on May 22, 2013 from LIM to ATL departed at 21:50 PDT.
   c. At 16:28 PDT (18:28 CDT) on May 26, 2013, Complainant made a reservation for May 27, 2013 travel from LIM to ATL using Delta pass privileges.
   d. At 21:50 PDT (23:50 CDT) on May 27, 2013, Complainant departed LIM.
   e. On May 28, 2013, Complainant arrived in ATL.

**I. December 2014 Events**

1. Complainant's Schedule:
   a. Complainant was assigned reserve duty December 8 through 11, 2014.
   b. On December 8, 2014, Complainant was on long call reserve status.
   c. At 10:00 PST (13:00 EST) on December 8, 2014, a short call assignment was added to Complainant's schedule to begin at 14:30 PST (17:30 EST) on December 9, 2018.
   d. At 12:03 PST (15:03 EST) on December 8, 2014, Complainant acknowledged his short call assignment to begin on December 9, 2018 at 14:30 PST.
   e. On December 9, 2014, Complainant had a short call assignment from 14:30 to 2:30 PST (17:30 to 05:30 EST).
   f. On December 10, 2014, Complainant was on long call reserve status.
   g. On December 11, 2014, Complainant was on long call reserve status.

2. Dates of Travel:
   a. At 7:22 PST (10:22 EST) on December 8, 2014, Complainant checked in for an Alaska jumpseat from SEA to Orlando International Airport ("MCO").
   b. At 9:53 PST (12:53 EST) on December 9, 2014, Complainant booked a flight using his Delta pass privileges from MCO to ATL to SEA (3 segments) with a scheduled arrival time in SEA of 18:49 PST (21:49 EST).
   c. At 12:00 PST (15:00 EST) on December 9, 2014, Complainant arrived in ATL (1st segment).
   d. On December 9, 2014, while Complainant was in ATL, he changed his Delta pass travel itinerary, to a flight from ATL to SEA with a stop at Detroit Metropolitan Airport ("DTW") with a scheduled arrival time in SEA of 22:07 PST (1:07 EST).
   e. At 14:30 PST (17:30 EST) on December 9, 2014, Complainant flew from ATL to DTW.
   f. At 16:30 PST (19:30 EST) on December 9, 2014, Complainant arrived at DTW.
   g. Complainant did not complete the last leg of this trip DTW to SEA on December 9, 2014.
   h. At 4:24 PST (7:24 EST) on December 10, 2014, Complainant flew from DTW to Fort Lauderdale-Hollywood International Airport ("FLL") using Delta pass privileges.
   i. At 07:16 PST (10:16 EST) on December 10, 2014, Complainant arrived in FLL.
   j. At 15:58 PST (18:58 EST) on December 10, 2014, Complainant flew from FLL to ATL using Delta pass privileges.
   k. At 5:10 PST (08:10 EST) on December 11, 2014, Complainant flew via Delta jumpseat from ATL to SEA, arriving in SEA at 10:53 PST (13:53 EST).

**J. February 28, 2015 Event**

1. On February 28, 2015, Complainant flew from SEA to ATL while on short call status.

**K. May 2015 Events**

1. Complainant's Schedule
   a. On May 11, 2015, Complainant was on a reserve X day.
   b. On May 12-14, Complainant was on reserve duty.
   c. On May 12, 2015, Complainant was on long call reserve status.
   d. At 8:27 PDT (11:27 EDT) on May 12, 2015, a short call assignment was added to Complainant's schedule, to begin at 14:00 PDT (17:00 EDT) on May 13, 2015.

e. At 15:12 PDT (18:12 EDT) on May 12, 2015, Complainant acknowledged his short call assignment.
f. On May 13, 2015, Complainant had a short call reserve assignment from 14:00 to 2:00 PDT (short call reserve period).
g. At 8:37 PDT (11:37 EDT) on May 13, 2015, a short call assignment was added to Complainant's schedule, to begin at 15:00 PDT on May 14, 2015.
h. At 11:05 PDT (14:05 EDT) on May 13, 2015, Complainant acknowledged his May 14, 2015 short call assignment.
i. On May 14, 2015, Complainant had a short call assignment from 15:00 to 3:00 PDT (short call reserve period).
j. At 10:42 PDT (13:42 EDT) on May 14, 2015, a short call assignment was added to Complainant's schedule, to begin at 15:00 PDT on May 15, 2015 until 3:00 PDT May 16, 2015.
k. At 11:41 PDT (14:41 EDT) on May 14, 2015, Complainant acknowledged his May 15, 2015 short call assignment.
l. Complainant had a short call reserve assignment between 15:00 PDT May 15, 2015 to 3:00 PDT May 16, 2015 (short call reserve period).

2. Dates of Travel:
   a. On May 11, 2015, Complainant checked in at 8:13 PDT (11:13 EDT) for a jumpseat on Alaska from SEA to ATL; he then continued on to FLL.
   b. At 10:23 PDT (13:23 EDT) on May 15, 2015, Complainant checked in for a jumpseat from Miami International Airport ("MIA") to SEA.

**L. August and September 2015 Events**

1. Complainant's Schedule:
   a. On August 29, 2015, Complainant was off duty.
   b. Complainant was scheduled for a three-day rotation (rotation 9507) to begin on August 30, 2015 at 2:55 PDT (5:55 EDT), but Complainant did not complete this rotation due to calling out sick.
   c. On August 31, 2015, Complainant transitioned from a regular line of flying to reserve status.
   d. Complainant was on long call reserve status effective August 31, 2015.

2. Dates of Travel:
   a. At 8:27 PDT (11:27 EDT) on August 30, 2015, Complainant flew via jumpseat on Alaska from SEA to FLL.
   b. At 19:37 PDT (21:37 EDT) on September 1, 2015, Complainant flew via UPS jumpseat from FLL to Louisville International Airport ("SDF").
   c. At 23:26 PDT (1:26 EDT) on September 2, 2015, Complainant continued via UPS jumpseat from SDF to Chicago Rockford International Airport ("RFD").

d. At 23:57 PDT (2:57 EDT) on September 3, 2015, Complainant flew via UPS jumpseat from RFD to King County International Airport/Boeing Field ("BFI").

3. Dates Called Out Sick:
   a. At 10:04 PDT (13:04 EDT) on August 29, 2015, Complainant called out sick for his three-day rotation (rotation 9507) that was scheduled to begin on August 30, 2015 with a report time at 2:55 PDT (5:55 EDT).
   b. On August 30, 2015, Complainant was on sick leave.
   c. On August 31, 2015. Complainant was on sick leave.
   d. On September 1, 2015 Complainant was on sick leave.
   e. On September 2, 2015, Complainant was on sick leave.
   f. At 6:06 PDT (9:06 EDT) on September 3, 2015, Complainant called in well.

## M. April 2016 Events

1. Complainant's Schedule:
   a. At 7:09 PDT (10:09 EDT) on April 19, 2016, Complainant as Captain/PIC blocked in on Flight 128 from Beijing Capital International Airport ("PEK") to SEA.
   b. Complainant was assigned a rotation scheduled for April 20-22, 2016 that had a report time of 10:22 PDT on April 20, 2016 (rotation P697), but Complainant did not complete this rotation due to calling out sick.
   c. On April 23, 2016, Complainant was off duty.
   d. At 20:00 PDT (17:00 EDT) on April 24, 2016, Complainant started a four-day trip flight assignment (rotation 9551). The trip was a "White Slip" trip, meaning Complainant requested the specific flying be added to his schedule.

2. Dates of Travel:
   a. On April 19, 2016, Complainant flew via jumpseat from SEA to MIA on an American Airlines flight that departed at 23:10 PDT.
   b. At 16:31 PDT (19:31 EDT) on April 21, 2016, Complainant flew via jumpseat on American Airlines from MIA to SEA.

3. Dates Called in Sick:
   a. At 8:03 PDT (11:03 EDT) on April 19, 2016, Complainant called in sick for his rotation (rotation P697) that was scheduled for April 20-22, 2016.
   b. On April 20, 2016, Complainant was on sick leave.
   c. On April 21, 2016, Complainant was on sick leave.
   d. On April 22, 2016, Complainant was on sick leave.
   e. At 7:27 PDT (10:27 EDT) on April 22, 2016, Complainant called in well without seeing a doctor.

N. **First Class Medical Information**

1. Pursuant to 14 C.F.R. § 61.23(a), a person must hold a first-class medical certificate to be a pilot-in-command.
2. Delta requires its Captains to hold a first-class medical certificate.

B. Additional Findings of Fact

Other than Complainant, the following individuals testified at the hearing:

- Richard Drey: a lead mechanic at Respondent. Tr. at 422.
- Ronald Phelps: at the time of these events was a technical analyst in the MRO services. Tr. at 441-42.
- Nick Gomez-Perez: Respondent's Maintenance Repair Organization ("MRO") Customer Service Manager. Tr. at 598. He holds degrees in aerospace engineering and mechanical engineering. Tr. at 602.
- Christopher Kelly: in 2016 was a principal engineer. He has a degree in mechanical engineering and is a member of Respondent's organizational delegation authority which allows him to make findings of compliance similar to a Designated Engineering Representative ("DER").[12] Tr. at 663-64, 721.
- Todd Herrington: Respondent's Director of Quality and Safety. Tr. at 723. In March 2016 he was the manager of Liaison Engineering for Respondent. Tr. at 724. He has a degree in mechanical engineering. Tr. at 741-42.
- Phillip Davis: from March 2013 until September 2017 was Respondent's Regional Director of Flight Operations for the West Region. He is an airline captain and holds an ATP certificate with ratings in the Boeing 757 and 767. He has about 12,000 flight hours all in jets. He conducted Respondent's investigation into Complainant's alleged misconduct. Tr. at 784-85.
- Jerrold Glass: the President of F&H Solutions Group, a management consulting firm specializing in labor relations and human resources. Tr. at 882. Mr. Glass holds a Master's in Public Administration from the George Washington University. Tr. at 884. He provided expert testimony for Respondent about Complainant's requested damages.
- Timothy Bishop: Respondent's General Manager of Regulatory Compliance. Tr. at 920. He holds a Master's in Business Administration from the University of St. Thomas and had a Bachelor of Science in Electrical Engineering Technology.
- James Graham: Respondent's Senior Vice President of Flight Operations and is the Part 119 Director of Operations.[13] He holds an ATP certificate with type ratings in the 757, 767, and 737. He has about 15,000 hours total flight time with 11,500 being in jets. He

[12] A DER is an individual appointed by the FAA per 14 C.F.R. § 183.29, who holds an engineering degree or equivalent, possesses technical knowledge and experience, and meets the qualification requirements of FAA Order 8100.8D (Oct. 28, 2011).

[13] Tr. at 965. The Federal Aviation Regulations ("FARs") require Part 121 air carrier certificate holders to employ full-time, qualified personnel in the following positions: Director of Safety, Director of Operations, Chief Pilot, Director of Maintenance, and Chief Inspector. 14 C.F.R. § 119.65(a).

has worked for Respondent for over 30 years. In April 2017, in addition to being the vice president of flight operations, he was also Respondent's Chief Pilot. Tr. at 963-65. Captain Graham is the individual that terminated Complainant's employment with Respondent. Tr. at 971; RX 230.

1. General Background Information

Respondent is a Part 121 air carrier. Tr. at 599. It also holds a Part 145 repair station certificate.[14] A repair station is an FAA-certificated facility authorized to perform maintenance, preventive maintenance, or alterations to aircraft and to return that aircraft to service. *See* 14 C.F.R. Part 145. Within Respondent's organization there is its Technical Operations Division ("RTOD"), and within the RTOD is the Maintenance Repair Organization ("MRO"). Tr. at 599. The MRO has a sales department that assists in Respondent's relationships with its maintenance customers. Tr. at 599.

Respondent's maintenance organization also has approval from the Direccion General De Aeronautical Chile ("DGAC-Chile")[15] to perform maintenance on certain aircraft, and it provided a supplement to Respondent's Part 145 manual for maintenance performed on its aircraft.[16] JX 12.[17] Any major repairs when a Supplemental Type Certificate ("STC")[18] is

---

[14] The FAA website lists Delta Air Lines, Inc. in Atlanta, Georgia as holding a Part 145 repair station certificate. *See* http://av-info.faa.gov/RepairStation.asp.

For details on repair stations, *see* FAA Order 8900.1, volume 2, chapter 11. In the case of maintenance performed on an air carrier's aircraft, a Part 145 repair station must follow that air carrier's maintenance program, whether the air carrier has a continuous airworthiness maintenance program ("CAMP") or in certain cases for Part 135 air carriers, can use the aircraft manufacturer's maintenance manual. 14 C.F.R. § 145.205(a). The methods, techniques and practices for conducting maintenance on a given air carrier's aircraft are specifically defined in the manual system required to be developed and maintained by the air carrier ... and used by the repair station. *See* 14 C.F.R. §§ 121.133 and 121.135(b)(17), (18) and (20).

[15] The Directorate General of Civil Aviation is the civil aviation authority in Chile. *See* https://www.dgas.gob.cl. This website is entirely in Spanish. Therefore, *see generally*, https://en.wikipedia.org/wiki/Directorate_General_of_Civil_Aviation_(Chile).

[16] The record contains the DGAC-Chile Repair Station Manual supplement with revision 1, dated May 12, 2015. JX 12. However, the Tribunal notes that Annex B to this supplemental manual does not list the Boeing 737 series aircraft as a type aircraft on which Respondent's repair station could perform major airframe repairs/alterations. *See* JX-12-28. Annex B does refer to the 737NG, but that entry only authorizes repairs to accessories and that aircraft identifier is not the same as a 737-500 aircraft. The Boeing 737 Next Generation (NG) comprises the 737-600, -700, -800 and -900 variants. *See* http://www.boeing.com/history/products/737-classic.page.

[17] *See also* JX-13-4 (Respondent's Repair Station Manual identifying the DGAC (Chile) supplement as being Appendix E to that manual).

[18] A supplemental type certificate is a modification of the type design of an aircraft that is approved by the Federal Aviation Administration ("FAA").

A Type Certificate ("TC") is a design approval issued by the FAA when an applicant demonstrates that a product complies with the applicable regulations. It includes the type design, the operating limitations, the certificate data sheet, and the applicable regulates that show compliance. *See* 14 C.F.R. § 21.41, *see also id.* at § 21.31, FAA Order 8110.4C, *Type Certification* (Mar. 28, 2007). An STC is a type certificate (TC) that is issued when an applicant has received FAA approval to modify an aeronautical product from

incorporated into a civil aircraft registered in Chile, must be approved by DGAC-Chile. JX-12-12. There does not exist a bilateral agreement between the United States and Chile concerning aircraft certification.[19] Tr. at 722-23.

Complainant is a pilot for Respondent and has worked for Respondent or a company Respondent acquired for over 30 years. He holds an airline transport pilot ("ATP") certificate with type ratings in the Boeing 727, 757 and 767, and has about 16,500 flight hours, mostly in transport category jets. Tr. at 55-56. While working for Respondent his schedule was mixed between regular lines of flying and reserve lines; about a 50/50 mix.[20] Tr. 206. Complainant does not hold any type of engineering degree. Tr. at 512-13. In 2016-2017, Complainant was based in Seattle. Tr. at 76, 109, 970.

In addition to flying for Respondent, Complainant acquired a business in 2001 called The Leading Edge Group, which in 2008 purchased the rights to STCs for Auxiliary Fuel Systems on certain aircraft from a company called PATS Aircraft.[21] Nearly all of the STCs Complainant purchased applied to aircraft with foreign registries. Tr. at 62. The STC at issue here[22] applied to and was installed on a single aircraft, a Boeing 737-500,[23] serial number 28866, which is owned by the Chilean Air Force ("CAF") and identified as FACH-921. Tr. at 66-67, 148; JX 11-10; JX-1C-9; *see also* CX 340. The STC for FACH-921's auxiliary fuel system consisted of three cells or tanks, as well as the electronics and hardware. A Design Approval Holder ("DAH") holder is required to provide certain manuals as a condition of their issuance to a

---

its original design. The STC, which incorporates by reference the related TC, approves not only the modification but also how that modification affects the original design. *See* 14 C.F.R. §§ 21.115, 21.117. Only a person that has received permission from the DAH, or actually holds the STC, can alter the aircraft using the data contained in a STC. 49 U.S.C. § 44704(b)(3). If the DAH agrees to permit another person to use the certificate to modify an aircraft, the DAH must provide the other person with written evidence, in a form acceptable to the FAA Administrator, of that agreement. 14. C.F.R. § 21.120.

[19] *See* https://www.faa.gov/aircraft/air_cert/international/bilateral_agreements/baa_basa_listing/.

[20] The Tribunal understands Complainant's testimony to mean that 50 percent of the time he was actually scheduled to fly and the remaining 50 percent he was on a standby status to cover trips that are not staffed because of illness, family emergencies, unforeseen weather conditions, or some other reason that the original pilot cannot complete the assignment. These pilots are required to be available by telephone on short notice within a specified window of time. The length a pilot can serve in each of the reserve statuses is regulated by 14 C.F.R. Part 117. In general there are two types of reserve pilots: long-call and short-call. *See* 14 C.F.R. §§ 117.3 and 117.21. At Respondent, a pilot on long-call reserve must be able to report for assignment at their base airport within 12 hours of an initial attempt to contact by crew schedule. Here, Complainant was based in Seattle. Tr. at 817, *see also id.* at 819-21. JX 17 which sets forth a pilot's long-call and short-call obligations. Pilots on reserve are paid when in that status. Tr. at 287. *See also,* JX 8B-5. For a general overview of the differences *see* Chip Wright, *Career Pilot: What is 'Reserve'? Rite of Passage has its Ups and Downs* (Jan. 2017), available at https://www.aopa.org/news-and-media/all-news/2017/january/flight-training-magazine/career-pilot-reserve.

[21] Complainant testified that he purchased 24 STCs from that company named PATS. These STCs pertained to Boeing 737 100-500 series, the DC-9 and MD-80 series aircraft. Tr. at 62. At the time of the hearing he still owned all 24 auxiliary fuel cell STCs. Tr. at 471-72.

[22] STC No. ST01337NY-D. *See* JX-1C-9 and JX-1C-10, RX 60.

[23] The Type Certificate Data Sheet for the Boeing 737-500 is A16WE. A copy is located at CX 352.

person authorized to use the STC. 14 C.F.R. §§ 21.5, 21.50, 23.1581. The maintenance manual "TO-632, Rev. A" is for this STC.[24] JX 11; *see also* RX 49. Section 5 of this manual contains mandatory conditions and procedures, unless an alternate procedure is approved by the FAA. Tr. at 400.

Complainant also owns a company called AirSpeed Engineering ("ASE") which provided the exclusive engineering support for Complainant's STCs. Tr. at 67, 229, 297. In 2016, Complainant also owned a company called ARC Avionics which was located in South Florida, near the Miami airport. Tr. at 77, 809.

At the time of purchase of the STC at issue, Complainant was aware that the FAA had issued two Airworthiness Directives ("ADs")[25] that affected the STC—one in 2006 and another in 2008.[26] Tr. at 59. Shortly after the purchase, Complainant learned from the FAA's Seattle Aircraft Certificate Office that the STCs were out of compliance. Tr. at 64. Complainant immediately started trying to get the STCs into compliance.[27] Tr. at 64-72. From a design approval standpoint, the most mature of the STCs Complainant held was the one that affected FACH-921, a Chilean government-owned Boeing 737-500 aircraft. Tr. at 70.

This particular STC had two configurations. Configuration 1 was the original installation of the aft tank group that consisted of three cells, and configuration 2 addressed the 2006 AD and the preliminary work necessary for the 2008 AD. Tr. at 71-72. The maintenance manual that applied to configuration 2 was TO-632, Rev. A. Chapter 5 of this manual contained its limitations section. Tr. at 72-73; JX 11-24 to -51. This version of the manual applied to FACH-921. Tr. at 72, 152, 665.

---

[24] TO 632 is also called "AMMS" in the record. The Tribunal understands this acronym to mean "aircraft maintenance manual supplement." *See* Tr. at 34.

[25] Airworthiness Directives are legally enforceable rules issued by the FAA per 14 C.F.R. Part 39 to correct an unsafe condition in an aircraft, engine, propeller, or appliance.

The issue of fuel tank flammability came to the aviation forefront following the TWA 800 tragedy and resulted, in part, with the enactment of 14 C.F.R. Part 26 that addresses continued airworthiness and safety improvements for transport category aircraft. Complainant tangentially referenced this in his testimony. *See* Tr. at 59-61. *See generally,* Advisory Circular ("AC") 120-98A, *Operator Information for Incorporating Fuel Tank Flammability Reduction Requirements into a Maintenance or Inspection Program* (Jun. 22, 2012), *available at* https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC%20120-98A.pdf. *See also* CX 368 (NTSB Safety Recommendations A-00-105 through -108, Sept. 19, 2000).

[26] The 2006 AD concerns structures while the 2008 AD related to electrical wire separations. Tr. at 71-72.

[27] Complainant initially petitioned for exemptions for his STC, but the FAA told him they were denied because any foreign aircraft could reenter the U.S. civil aviation system by use of an air carrier and then operate under Part 121 or 135. Tr. at 63. The process to get the STCs in to compliance took about a year and a half and cost his company about $375,000. Tr. at 64-72.

2. Maintenance Issues around FACH-921's Auxiliary Fuel Cells

On or about January 4, 2016, the CAF brought FACH-921 to Respondent's facility in Atlanta—a Part 145 repair station[28]—for a C-check.[29] Tr. at 623. The aircraft was not a U.S. registered aircraft, and was not engaged in common carriage or the carriage of mail.[30] Tr. at 620. The CAF assigned two military officers who remained on site as its representatives while Respondent worked on the aircraft. Tr. at 619. Chile has its own Directorate General for Civil Aviation which is the civil aviation authority in Chile; Chile's equivalent of the FAA. Tr. at 620. The CAF personnel requested that Respondent follow regulatory guidance approved by the Chilean DGAC; however, according to a Respondent witness, that guidance does not apply because FACH-921 is a foreign military aircraft. Tr. at 934.

Respondent had promised the CAF that Respondent would complete the inspection within a 35-day turn-around time.[31] The maintenance performed on the aircraft was conducted consistent with 14 C.F.R. Part 145. Tr. at 934. In January 2016, the CAF had its own maintenance program. Tr. at 621. As part of contract between Respondent and the CAF, the CAF was to provide Respondent will all of the manuals, service bulletins, and airworthiness directives applicable to the aircraft that Respondent is to follow. Tr. at 613-14; RX 185 at 3, 15, 16. According to Respondent's MRO Customer Service Manager, when Respondent is performing maintenance it follows the customer's manuals consistent with its Repair Station Manual and its Operations Policies and Procedures.[32] Tr. at 616.

Complainant first learned that this aircraft was at RTOD on or about January 8, 2016, when a person in his company received a call from RTOD for part support. Tr. at 74-75, 78-79, 402; RX 4. During an inspection, Respondent had determined that it needed some parts and data to repair the aircraft's auxiliary fuel tank system which was subject to Complainant's STC.

[28] Respondent refers to its repair station as a maintenance repair organization or "MRO." Tr. at 34.

[29] A C-check is a heavy maintenance inspection of an aircraft's individual systems and components that is required by the aircraft manufacturer every 12-18 months or after a specific number of flight hours. It entails hundreds of tasks. Tr. at 463. It requires a thorough visual inspection of specified areas and systems as well as functional checks. It normally requires specialized tooling, testing equipment and specialized maintenance skills. *See generally,* Qantas News Room, *The A, C and D of aircraft maintenance* (July 18, 2016), available at https://www.qantasnewsroom.com.au/roo-tales/the-a-c-and-d-of-aircraft-maintenance/. According to Respondent's MRO customer service manager, CAF brought FACH-921 to its facility because, although CAF had its own maintenance program, Respondent had capabilities, labor power, and specialties the CAF did not have. Tr. at 621.

[30] Although it states the obvious, the CAF is not a citizen of the United States. Tr. at 604.

[31] Tr. at 602; *see also* JX-15-2. In addition to conducting a C-check, the 35-days included repainting the aircraft. Tr. at 605. The aircraft departed Respondent's facility on March 13, 2016. Tr. at 324, 602. As one of Respondent's lead mechanics testified, trying to meet the original turnaround time for completion of a C-check on an aircraft "is always a concern." Tr. at 433-34.

[32] In many instances, the FAA requires certificated repair stations to follow this practice. *See* 14 C.F.R. § 145.205. However, this requirement only applies when maintenance is being performed on aircraft operating under Part 121, Part 135, or a foreign air carrier operating a U.S. registered aircraft under Part 129. Foreign military aircraft—such as FACH-921—do not fall within any of these categories.

Specifically, one of the fuel cells had dents,[33] and a 10-PSI pressure relief valve failed a test during its inspection.[34] Consequently, Respondent contacted Complainant and he in turn provided quotes to Respondent to address the dents and the valve. Tr. at 93, 97-101; JX-8C-6; JX-8C-11; CX 32. Another option for the aircraft was to defer the repairs and deactivate the system by use of an FAA approved Service Bulletin ("SB"). Tr. at 96-97, 99, 101, 104, 108-09, 184; CX 19; CX 20; CX 50. However, at that time, an approved SB did not exist. It was Complainant's view that, since the FAA did not approve the aircraft to operate with these auxiliary fuel cells installed but not operating, deactivating the system and allowing it to operate was a safety issue. Tr. at 167-68.

On January 11, 2016, Complainant wrote to Respondent's Chief Pilot[35] to inform him that he had been engaged with RTOD for part support on an STC that he owned. Tr. at 79-80; CX 3; *see also* Tr. at 301-02. It was his belief that the response he received from his assistant chief pilot cleared him of any conflict issues.[36] Tr. at 77; CX 3. Also, by this date, RTOD was aware that FACH-921's auxiliary fuel tanks had some damage and it began attempts to locate the DAH. RX-101-7. On January 15, 2016, RTOD contacted Complainant informing him about the auxiliary fuel tank having dents in two locations. RX-101-6; CX 6.

On January 15, 2016, one of Respondent's lead mechanics made the determination that two dents that existed on one of the auxiliary fuel tanks installed in FACH-921 were out of allowable limits. Tr. at 422-23, 442-43; CX 6; RX-103-2. As the manuals the mechanics were using did not have allowable dent size limits, Respondent contacted AirSpeed Engineering. Tr. at 423.

On January 18, 2016, Complainant began to communicate with the FAA about the failure of the 10-PSI pressure relief value. Tr. at 174-75. Complainant believed that, as the DAH, he was required to report this per 14 C.F.R. § 21.3. Tr. at 175.

On January 19, 2016, Complainant flew to Lima, Peru, via Atlanta (where FACH-921 was located) on a non-revenue pass issued by Respondent to visit friends and to attend a Maintenance Repair Organization ("MRO") conference. Tr. at 85-86, 90, 485. This conference was sponsored by Respondent and occurred on January 21, 2016. Complainant attended the conference on behalf of AirSpeed Engineering, in hopes of meeting other Respondent personnel working on FACH-921.[37] Tr. at 81-82, 107, 297, 300, 303, 319; CX 49. According to

---

[33] RX 211; CX 3. Complainant was not aware of the fuel cell dents until January 15, 2016, three days after he had signed up for the MRO conference. Tr. at 315, 396, 402; RX 4.

[34] Tr. at 91, 93, 95, 98; CX 3; CX 8; CX 9; CX 24.

[35] Complainant's chief pilot in the Seattle office was copied on this email as was Respondent's assistant chief pilot.

[36] However, when the Tribunal asked about this, Complainant admitted that he never formally asked if was conflict of interest with Respondent about his business operations in dealing with Respondent. Tr. at 78.

[37] Complainant also admitted that a fallback purpose for going to the MRO conference was to promote his flight management system ("FMS") to Respondent. This was an avionics system being developed by ARC avionics, another company he owned in 2016. Tr. at 315-17.

Complainant, Ms. Susan Davis, one of the women at his company,[38] made the reservations to attend that conference using his personal email address; this was the only time she had used his personal email address. Tr. at 83-84, 486-88; RX 7. The attendance fee for this conference was $1,395, but that fee was waived if one was associated with Respondent's MRO. Tr. at 489; RX 8. Complainant was registered in a manner whereby this fee was waived.[39] Tr. at 490-94; *see also* CX-117-1. During this trip, Complainant did not see his friends in Lima, but did attend the conference. Tr. at 85-86, 297. Complainant thought the conference was an opportunity to learn of a point of contact in Respondent's RTOD. Tr. at 81. However, Complainant did not meet any CAF Technical Operations contacts. Tr. at 82-83. Complainant did speak with some of RTOD's attendees, but none of them had anything to do with FACH-921. Tr. at 242, 320, 638-40.

On January 20, 2016, Complainant advised RTOD and CAF personnel in an email that a functioning 10-PSI valve was an airworthiness limitation item required by the STC manual. CX 34; Tr. 97; *see also* CX 340, JX-11-40, RX-104-1. On January 21, 2016, Complainant sent an email containing a quote for non-destructive testing and other proposed testing of the auxiliary fuel tank system. Tr. at 93-96, 527; RX 116; *see also* CX 24; CX 48; CX 49. In these emails, Complainant represented that his travel for the initial consultation with RTOD in Atlanta would be no charge because the airfare was courtesy of Respondent. Tr. at 530; RX 116-8; *see also* RX-12-8. Complainant claimed that his email on January 11, 2016 from his chief pilot provided Respondent with notice that he was supporting RTOD in its repair of the CAF aircraft. Tr. at 531-32; *see also* CX 3.

On January 22, 2016, Complainant was in Atlanta, Georgia. Tr. at 112. Complainant called a Respondent representative at the RTOD, using a number he had obtained while attending the conference in Lima. Tr. at 112, 629-31; *see also* RX-188-1; CX-20-1; CX 58. Complainant says he called to say that he was available for a meeting and he was invited to come to RTOD in Atlanta to meet concerning FACH-921's auxiliary fuel system. Tr. at 113. It was during this call that Complainant informed RTOD personnel that he was a Respondent employee. Tr. at 444; CX 65; CX 71. The person that talked to Complainant immediately emailed RTOD management about his concerns of a possible conflict of interest. Tr. at 458, 706, 727-28; RX 245; RX-121-1.[40] When Complainant went to the RTOD and during the subsequent meeting with CAF personnel he was acting in his capacity as a DAH. Tr. at 242.

When Complainant arrived by car, he showed the guard his Respondent-issued crewmember ID badge. Tr. at 113. Once on foot he was buzzed in by another guard to get through the "cheese grater" for he did not possess an access card. Tr. at 114, 234-35; *see also* Tr. at 751. At the time he was at that facility, Complainant wore his ID badge identifying himself as a Respondent flight crewmember. Tr. at 115. Complainant signed in to the facility as a Seattle-based pilot and a representative of Airspeed, his company. Tr. at 115. He listed

---

[38] According to Complainant, Ms. Davis also happened to be deep in to working on the FACH-921's maintenance manual at that time. Tr. at 83-84.

[39] The Tribunal finds Complainant's rationale or explanation to justify waiver of the fee to attend this conference questionable at best.

[40] *See also* RX 68; RX-120-1; RX 137; CX-62-1; CX 63; CX-64-1.

himself as an escort. Tr. at 235, 732; JX-8B-122. Eventually, he found the aircraft[41] and he was escorted around the aircraft and shown the fuel tank dents; at that time the fuel tanks were removed from the aircraft. Tr. at 117. Complainant and RTOD personnel had a meeting that included a discussion about whether or not there was a conflict of interest with a Respondent employee also representing the MRO. Tr. at 445. RTOD personnel asked him to remove his crewmember ID badge prior to him meeting with CAF personnel. Tr. at 241. Complainant then met with RTOD personnel and presented to CAF personnel detailed information[42] about the airworthiness limitations for the auxiliary fuel system, asserting that the STC limitations section of the maintenance manual for the aircraft was mandatory.[43] Tr. at 120-51;[44] CX 354; JX 11. Complainant explained that the risk with the tanks was the accumulation of fumes and fuel in areas of the tanks not monitored if an electrical arc occurred. Tr. at 151-52;[45] *see also* JX-11-146. According to Complainant, after this meeting RTOD personnel quit communicating with him about FACH-921. Tr. at 481; *see also* Tr. at 710.

On January 22, 2016, the CAF decided not to have the auxiliary fuel cells repaired and instead decided to deactivate the system[46] using a procedure Respondent took from the maintenance manual.[47] Tr. at 170-71, 398, 404, 429-30; CX 69; CX 72; CX 74; RX 4; RX 153. A CAF representative informed Complainant by email of their decision to not use his services. Tr. at 707; RX 124. However, according to Complainant, Respondent used a deactivation

---

[41] *See* Tr. at 236-40.

[42] One of the RTOD personnel that attended this meeting with Complainant, RTOD personnel and CAF personnel, testified during the hearing. He did not remember Complainant giving a Powerpoint presentation—like the one given at the hearing—to the CAF personnel during this meeting. Tr. at 453.

[43] Only the Section 5 (containing airworthiness limitations) of the manual is FAA approved. Tr. at 245.

[44] Complainant agreed that there were three meetings at the RTOD that day. One was with Todd Harrington from Tech Ops, the other was with RTOD Staff, and the third was with CAF personnel in a big conference room. Tr. at 240.

[45] *See also* CX 24; CX 28; CX 30; CX 32; CX 34; CX 35. Complainant explained the auxiliary fuel tank system, the location of its electric components, the proposed deactivation procedures, and why he had concerns about the manner of deactivation of the system during the hearing. Tr. at 158-70.

[46] Tr. at 458-59, 687; RX 100 at 5; RX 211. Accomplishment of the deactivation is reflected in RTOD Task Card s/n 00494 (RX 211 at 5) and the aircraft log entries (RX-211 at 3-4). Tr. at 950-51; *see also* JX 16. The CAF representatives—who controlled the maintenance on the aircraft—approved the deactivation and directed that it be completed following the technical data used by Respondent. RX 211 at 6; Tr. at 952-53. One witness recalled the decision was made later that day on January 22, 2016 following the meeting with Complainant. Tr. at 459; *see also* RX 123.

[47] Complainant asserted that Respondent's personnel asked CAF if they could skip steps required in the auxiliary fuel system maintenance manual (JX 11 at 115-16) for deactivation of the system. Tr. at 198-99, 429-30; CX 169.

Additionally, Complainant testified that within six months of CAF's decision to deactivate the auxiliary fuel tank system, he was contacted by three different parts brokers looking for a replacement for that 10-PSI pressure relief valve. Tr. at 180 185, 367-68; CX 180. However, Respondent's manager for MRO customer services testified that the issue with the valve was resolved during the C-check. Respondent discovered after the valve was removed that debris was obstructing its functioning and, once the debris was removed, the valve worked properly, which is why Respondent cancelled the order for the valve. Tr. at 637-38; RX 193; *see also* CX-180-1; CX-184-2.

procedure that deviated from the maintenance manual as a whole.[48] CX 169. Complainant's concern was that the CAF was flying FACH-921 with a deactivated system not properly addressed in the flight manual supplement. Tr. at 327-28. However, Mr. Drey—one of Respondent's lead mechanics—testified that Respondent performed the deactivation per the manual, and not as described in the email presented to him (CX 169) at the hearing by Complainant.[49] Tr. at 429; *see also* Tr. at 450, 460. He specifically recalled how the CAF personnel were disappointed that deactivation could not occur by just pulling circuit breakers. He testified the deactivation procedure Respondent conducted included disconnecting all four of the valves, "jumpering" the valves closed, and securing the auxiliary fuel tank system. Tr. at 429-30; *see also* CX 171.

On January 25 or 26, 2016, Complainant began engaging the FAA in Seattle about his concerns with the deactivation of the auxiliary fuel system. He proposed that the FAA issue a deactivation service bulletin and a temporary revision to the STC flight manual supplement that would allow CAF to fly the aircraft out of Atlanta with the fuel system deactivated. Tr. at 175-76, 204.

According to Complainant, the FAA agreed that deactivating the auxiliary fuel tanks required an FAA-approved deactivation procedure. Tr. at 403. Complainant had developed a deactivation procedure in the form of a Service Bulletin and submitted one on January 29, 2016

---

[48] Complainant testified that he later learned how Respondent conducted the deactivation via an email from CAF to Respondent detailing Respondent's suggested deactivation procedure. Tr. at 442. Complainant explained the steps he believed Respondent skipped, referencing JX 11, pages 21, 25, 26, 34-43. Tr. at 552-65. One of Respondent's mechanical engineers testified about the deactivation of the auxiliary fuel system and explained how the maintenance Respondent performed prevented air or fuel from traveling in between the center tank and the auxiliary tanks. Tr. at 659-62, 673; JX 11at 115. He also explained how Complainant's understanding of the general system was incorrect, including a mistaken belief concerning the location of one of the 10-PSI pressure relief valves in the tank. Tr. at 666-80; *see also* JX 11 at 96, 116, 132.

[49] Mr. Phelps, one of Respondent's employees at MRO services, testified that if the maintenance required was not specified in the manual, engineering would have been consulted and generated either a card or engineering document. Tr. at 460-61. He reviewed the non-routine card used to perform the deactivation of the auxiliary fuel cell system and, in his opinion, the aircraft was returned to service in a safe and airworthy condition. Tr. at 461. Mr. Phelps holds an airframe and powerplant mechanic certificate. Tr. at 462.

Mr. Kelly, one of Respondent's principal engineers, also testified that the maintenance performed was in accord with the manual and referenced both the maintenance manual (JX 11) and the aircraft's maintenance records that concerned the fuel cell tank dents. Tr. at 680-87; RX 100; JX 16 (Task Card 280). Mr. Kelly also testified that the getting resolution on the fuel tank dents does not normally rise to the level of having to write a service bulletin. Tr. at 699; *see also* Tr. at 726. He testified that the system was deactivated such that pilots could not have reactivated it from the cockpit inadvertently. Tr. at 714.

Mr. Herrington, a mechanical engineering, testified that FACH-921's master minimum equipment list ("MMEL") addressed the auxiliary fuel system, but he did not know if CAF had adopted the MMEL. Tr. at 743-44; RX 135. He testified that he reviewed FACH-921's maintenance records and the system was deactivated per the aircraft maintenance manual procedure. Tr. at 745.

for FAA approval, but the FAA had not approved it.[50] Tr. at 333-35. On February 2, 2016, Complainant wrote to Respondent telling its representatives that the deactivation of the auxiliary fuel cell is a major change to the product design. Tr. at 433; CX 141. Thus, Complainant asserted that at the time he believed Respondent had probably violated the Federal Aviation Regulations by releasing the airplane. Tr. at 410-11; RX 4 at 5.

At no point in time during this process did Complainant have a contract with Respondent or the CAF to provide or perform any of his offered services. Tr. at 165, 173-74, 184, 548.

### 3. Respondent's Investigation into Complainant's Potential Conflict of Interest and Use of Travel Privileges

Immediately following the January 22, 2016 meeting at the RTOD, Respondent's representatives began checking on Complainant's registration at the RTOD due to concerns that he had signed in improperly and may have a conflict of interest.[51] On January 25, 2016, Respondent's representatives advised its Human Resources and Captain Davis[52] about their concerns with Complainant's arrival at RTOD. This triggered an investigation by Captain Davis that occurred from January to August 2016. Tr. at 788, 998. Respondent's Chief Pilot, Captain Graham, was regularly briefed about the ongoing progress of the investigation. Tr. at 974-75.

Respondent has no standard procedures concerning how to investigate its pilots. Tr. at 860. Captain Davis had two areas of concern. First, Complainant was a Respondent pilot and a vendor and there might be some sort of conflict of interest. Second, Complainant may have used Respondent's business positive space travel[53] to attend a conference in Lima, Peru. Captain Davis quickly learned that Complainant had not used company business positive space for his flight to Lima, Peru and return, but he had used non-revenue travel standby. Tr. at 789-90. Captain Davis did not become involved in the conflict of interest investigation—Respondent's HR department performed that[54]—but he did obtain the RTOD sign-in log. Tr. at 790-91; JX-8B-122. During the subsequent investigation into Complainant's actions, Captain Davis discovered several events where he believed Complainant misused privileges and benefits in addition to the issue of his access to the RTOD and the potential conflict of interest between his employment with Respondent and his business activity.

---

[50] Tr. at 516-18; RX 41. The Service Bulletin that Complainant developed, but was never approved, would have cost the CAF about $25,000. Tr. at 404-05.

[51] Tr. at 428-29, 731-35; RX 138-1 to RX-138-2; RX 145; CX 76 to CX 80; CX 82 to CX 91; CX 111; CX-121-1; *see also* JX 8B-106.

[52] Captain Davis' responsibilities in 2016 included oversight of Respondent's bases in Seattle, Los Angele and Salt Lake City. His duties include addressing the disciplinary aspects of pilots under his charge. He reported to Captain O.C. Miller, the managing director of Flying Operations. In 2016 the Seattle base chief pilot was Captain Rip Johnson. Tr. at 784-87.

[53] The Tribunal understands that company business positive space is a form of travel when an employee receives preferential treatment for seats available on a given flight because the reason for the travel is for Respondent's business activities. In essence it guarantees the holder of the ticket a seat on an airplane. This is in contrast to standby or "space available" travel.

[54] Tr. at 792. In April 2016, Respondent's Human Resources Department communicated with Captain Davis that they were not going to go any further with their investigation. Tr. at 793, 862.

As part of his investigation, Captain Davis looked at Complainant's travel to determine if Complainant had used non-revenue travel to go to Lima and back. Tr. at 796. Respondent has a Pass Travel Policy which provides: "Pass travel privileges other than those issued for official company or government business, are to be used solely for leisure or emergency travel." JX 8B-9. The policy further provides:

> Any employee or pass ride who uses their pass travel privileges for personal business or other purposes not specifically permitted in this document, . . . or who violate any other provision of this document, will subject the responsible employee and the pass rider to disciplinary action, up to and including suspension of pass travel privileges and termination of employment.

JX-8B-9. This policy has been in effect as long as Captain Davis has worked for the company, since 1989, and Respondent employees are trained about this standard. Tr. at 785, 798.

Complainant's flight duty schedule included both actual flight assignments as well as being on reserve duty. Tr. at 254. Respondent's pilots bid for their schedules using a preference system, and a pilot could identify a preference for flight time or reserve duty. Tr. at 254-55. At the Seattle base, Complainant is near the top of the seniority list. Complainant's seniority allowed him to get the schedule he wanted. Tr. at 255.

Captain Davis examined Complainant's non-revenue travel history from January 1, 2013 to April 13, 2016. Tr. at 799; *see also* JX-8B-15 to JX 8B-18. Records show that Complainant used non-revenue travel on January 19, 2016 from Chicago to Atlanta and then Atlanta to Lima,[55] returning on January 22, 2016 from Lima to Atlanta, and then on January 24, 2016 travelling from Atlanta to Seattle. Tr. at 799; JX-8B-18. Captain Davis suspected that Complainant had used non-revenue travel for other business trips, so he looked closer into Complainant's travel records. Tr. at 800-01. Captain Davis knew that Complainant owned ARC Avionics, which operated out of South Florida, so he looked for non-revenue flights that Complainant took to airports in that area. Captain Davis discovered that Complainant made several flights to Miami and Fort Lauderdale. However, there were times he could only see how he got there, but he was missing a leg of the travel. Tr. at 809. This suggested to him that Complainant used another method to travel, such as jumpseat travel.[56] So he looked in to Complainant's jumpseat travel records. Because the system that retains this data can only be searched on a day-by-day basis, rather than permitting a single search across a range of dates, this took Captain Davis some time to accomplish. Tr. at 810-11. JX 17 contains the dates of Complainant's jumpseat travel.

---

[55] Captain Davis testified that the flight from Atlanta to Lima is approximately five and a half hours and the flight from Seattle to Atlanta is about four hours. Tr. at 801-02.

[56] At Respondent, eligible flight deck crewmembers could fly for free in the "jumpseat" of an aircraft—assuming it was open—both on Respondent's flights and on flights of other carriers. Tr. at 270-71; JX-8B-76 to -83; *see also* 14 C.F.R. § 121.547.

According to Captain Davis, Respondent's jumpseat policy does not allow an eligible crewmember to use the jumpseat while sick. Tr. at 812; *see also* JX-8B-69; JX-8B-81.[57] In his opinion, if a pilot is too sick to fly for Respondent, he should not be riding in the cockpit as an additional crewmember for another airline, which is what a person riding jumpseat is.[58] Tr. at 815.

After Captain Davis obtained records of Complainant's jumpseat and non-revenue pass travel, he overlaid them with Complainant's flight schedules (RX 147). Captain Davis discovered Complainant's travel to Lima from May 20-28, 2013, and discussed this with Complainant during his interviews with him. Tr. at 831-35; *see also* JX-8B-53; CX-215; CX 227. Captain Davis also discussed his use of sick leave during the period May 23-25, 2013. Complainant was scheduled to be on reserve during these days; however, at that time he was in Lima, Peru. Complainant asserted that he acquired a stomach bug from eating bad chicken at a local franchise.[59] Tr. at 268. Complainant admitted that he used non-revenue travel to get to Lima. Tr. at 269. During that trip, on May 16, 2016, Complainant used Respondent's authorized personal drop ("APD") scheduling provision to obtain additional time off (May 26-28). This APD provision allows an employee to request days off duty and provides a slightly better chance of getting those days off. Tr. at 833. In looking at the travel records, Captain Davis learned that Complainant was in Seattle on May 20, 2013 at 1950 Pacific Time. He also knew that Complainant called in sick from a hotel in Lima on May 22, 2013. Tr. at 834. So it appeared Complainant flew to Lima on May 21, 2013. During that time he left for Lima he was on reserve duty and would not have been able to report back to his Seattle base in time if he had been called for his reserve duty. Tr. at 835. On May 21, 2013, Complainant had already been assigned reserve duty on May 23, 24, and 25, and then he utilized his APD provision to get May 26-29 off. Tr. at 835; *see also* JX 17; JX-8B-53.

During December 8-11, 2014, Complainant was in a long-call reserve status. Tr. at 256, 836; JX-8B-56. On December 8, 2014, Complainant flew jumpseat from Seattle to Orlando while on long-call reserve. While en route, Complainant was notified of a short-call assignment to begin at 1430 Pacific Time, December 9, 2014. Complainant acknowledged the status change to short-duty, but failed to travel to Seattle for the reserve obligation. Tr. at 257. He spent his short-call period in Detroit and thereafter flew to Fort Lauderdale when he was returned to long-call reserve on December 10, 2014; not returning to Seattle until December 11, 2014. JX-8B-56 to -57. Complainant admitted that he was out of position during his second interview with Captain Davis. Tr. at 837. He admitted that he visited ARC avionics during this visit. Tr. at 258. In December 2014, Complainant purchased ARC Avionics. Tr. at 837. Complainant admitted that he took a chance by travelling while in a long reserve status, "[a]nd it failed." Tr. at 258. During Captain Davis' investigation, Respondent also learned that around February 28, 2015, Complainant left Seattle for Atlanta while he was on short-call reserve, again being out of position. Complainant admitted doing this. Tr. at 264-65.

---

[57] Respondent's Jumpseat Guide is located at JX-8B-76 to JX-8B-83.

[58] *See* 14 C.F.R. § 121.547.

[59] During Complainant's third interview with Captain Davis, held on October 19, 2016, Complainant recalled he had eaten some chicken from KFC and had fallen ill and was in a hotel room in Lima at the time he called in sick. Tr. at 832-33.

Captain Davis learned that Complainant was out of position while on reserve duty a third time during the period May 13-14, 2015 when he travelled to South Florida. Tr. at 265. Complainant was out of position for his reserve assignment during the period May 11-15, 2015 over multiple days and multiple short call events. Tr. at 837; JX-8B-59 to -60. During Captain Davis' third interview with Complainant, Complainant admitted that he was in South Florida, Atlanta, and Florida; that he was out of place for his reserve obligations; and that he had traveled to perform business. Tr. at 837.

Captain Davis saw a pattern that Complainant had put himself out of position for his reserve duty obligations. Tr. at 824. At that point Captain Davis decided that he wanted to meet with Complainant, but was not able to do so until August 24, 2016. Prior to that interview, he continued his investigation and looked more into the MRO Conference Complainant attended in Lima. Tr. at 824-26. In his research, Captain Davis discovered that Complainant was registered for that conference as an airline VIP from "Tech Ops."[60] JX-8B-05. Complainant did not qualify for an airline VIP pass. JX-8B-46. Captain Davis found this improper. Tr. at 826-27.

During his investigation, Captain Davis also discovered issues with Complainant's use of sick leave. On August 29, 2015, he called in sick for a three-day flight rotation but then traveled by jumpseat the next day from Seattle to Fort Lauderdale. While in Florida, Complainant "checked in" on one of his businesses that he owns, ARC Avionics. Tr. at 282-83. The following day, Complainant transitioned to reserve status, yet flew jumpseat from Florida to Rockford, Illinois—where he has a home—and spend two days there working on the property. He flew jumpseat again back to Seattle. Tr. at 285, 838; JX-8B-62.

On April 19, 2016, Complainant served as a captain on a Boeing 767 flying from China to Seattle. While taxiing back to the terminal he mistakenly turned the aircraft the wrong way on a taxiway.[61] Tr. at 839. Complainant testified that when he made the turn he felt pain in his wrist where he previously had surgery. Tr. at 291. However, Captain Davis testified that, when he asked Complainant to explain what happened, Complainant said his hand involuntarily moved causing the airplane to turn. Tr. at 975. Following this flight Complainant called in sick for an assigned rotation scheduled to depart the next day. Tr. at 288. But that evening Complainant got on a redeye to Fort Lauderdale and "check[ed] in on" ARC Avionics. Tr. at 294. Specifically, Complainant landed in Seattle at 0709 Pacific Time, called in sick at 0803 Pacific Time, but was able to fly from Seattle to Miami on another air carrier's redeye flight on April 20, 2016. JX-8B-64.[62] JX-8B-130 shows that Complainant purchased a ZED fare only one hour and thirty

---

[60] "Tech Ops" refers to the RTOD.

[61] This could have been a violation of 14 C.F.R. § 91.123(a) or (b).

[62] Captain Davis clarified that the comment on JX-8B-64—that Complainant "jumpseated" from SEA-MIA—was incorrect. Complainant actually purchased a significantly reduced airfare as reflected on JX-8B-130. Tr. at 843. This is consistent with Complainant's testimony; he was unclear as to whether he flew jumpseat or purchased a "ZED" fare, which is a ticket available to crews at a substantial discount. *See* Tr. at 294-96.

minutes after calling in sick.[63] Tr. at 839-43, 845-46. To Captain Davis, this demonstrated planning on Complainant's part to get to Florida. Tr. at 844.

4. Travel Companion Pass Usage

In late April 2016, when HR advised Captain Davis that they were not going to pursue the conflict of interest investigation further, they did suggest that there may be some issues with Complainant's non-revenue travel and that of his companion ride, Mr. Chok-Pin Foo. Tr. at 862. Captain Davis looked at Mr. Foo's travel from January 1, 2014 to May 11, 2016. Tr. at 802, 862; JX-8B-20. What struck out to Captain Davis was the amount of international travel and, when he overlaid Mr. Foo's travel with Complainant's, there was not a single instance of them traveling together. Captain Davis tried to learn who Mr. Foo was and discovered that he was related to Leading Edge Group, one of Complainant's companies. Tr. at 803; JX-8B-27. This raised in Captain Davis' mind the possibility that Mr. Foo worked for one of Complainant's companies. Captain Davis also discovered that Mr. Foo was associated with MAP International, where he was a director and interim CEO and this company was located in Brunswick, Georgia. In reviewing Mr. Foo's non-revenue travel, there are entries for travel to the Brunswick airport. Tr. at 805; JX-8B-20. Mr. Foo was also associated with Trust Bridge Global, a 501(3)(C) that had offices in Tampa and Switzerland. The records showed non-revenue travel to both Tampa and Switzerland. Tr. at 808; *see also* JX-8B-20 to -22.

Respondent provides its employees with non-revenue pass travel privileges, but limits their usage to leisure or emergency travel. Tr. at 243. Complainant admitted that he travelled to Miami to talk to ARC about FACH-921 for business purposes in early January 2016. Tr. at 243. Complainant has identified Mr. Chok-Pin Foo as a travel companion for Respondent's non-revenue passes. Tr. at 246. Mr. Foo is Complainant's friend who he has known for 25 years. Tr. at 305. Complainant gave Mr. Foo Complainant's Travelnet password and sign-on so Mr. Foo would make his own travel arrangements. Tr. at 246-49, 588-89.[64] However, Respondent trains its employees not to share their password or login credentials. Tr. at 850. JX-8B-34 reflects that Complainant received this training. Tr. at 853; *see also* JX-8B-41. A pilot's login credentials provide access to Deltanet, a company-wide net of information. They also provide the pilot with access to Travelnet, which is where employees book non-revenue or Respondent business travel reservations. Provision of an employee's login credentials to a non-employee was risky, however, because access to Deltanet also allowed the user to access Respondent's "I-crew" site. I-crew allows Respondent's crewmembers to interact with their scheduling and to see other crewmembers' schedules and personal information. Tr. at 851-52. Captain Davis

[63] On April 19, 2016, Complainant called in sick at 0803 Pacific Time for a 3-day leg with a report time of 1022 Pacific Time, April 20, 2016. JX-8B-64. Complainant made reservations for a discounted flight at 1132 Central time or 0932 Pacific Time. JX-8B-130.

[64] When the Tribunal inquired about what information someone can obtain from this system, Complainant said the system would allow a user to have access to their schedule, get into "Deltamatic" for travel, and "might be able to download some aircraft documents" like flight manuals. Tr. at 586. He also testified that access to this system would not provide the user with arrival or departure times, but would permit access to loads and the number of passengers in business class—information that an employee could use to see his chances of getting on a particular flight. Tr. at 586-87.

asserted that Respondent considered it important to keep this information secure—for competitive reasons, but mostly for privacy and security reasons. Tr. at 852.

Mr. Foo used Complainant's non-revenue pass on at least 13 occasions for MAP International.[65] Tr. at 248-49. Complainant admitted that at the time he shared his login and password information with Mr. Foo, he knew that this violated Respondent's non-revenue travel policy.[66] Tr. at 247. During Complainant's October 19, 2016 interview with Captain Davis, Complainant provided JX-8B-85, which he said represented Mr. Foo's travel for business purposes. Tr. at 857-58.

On August 17, 2016, Captain Rip Johnson contacted Complainant and informed him of the need to interview him on August 24, 2016. Captain Johnson instructed Complainant to bring his logbook and travel records with him. Tr. at 192-93, 828. Complainant responded with an email, which is how Captain Davis first learned about Complainant's concerns regarding flight safety issues at RTOD. Tr. at 193, 829-30; RX 151; CX 203.

On August 24, 2016, Complainant attended that interview. Captain Phil Davis, Captain O.C. Miller, Captain Johnson, Complainant, and two union representatives were also present. Tr. at 193-94. During this meeting, Complainant was asked why he was in Lima, Peru. Tr. at 194. No mention was made about his visit to RTOD in January or the misuse of his pilot credentials. Tr. at 195.

Captain Davis interviewed Complainant a total of three times: August 24, 2016,[67] September 15, 2016,[68] and on October 19, 2016.[69] Tr. at 221, 831. There was a fourth meeting that occurred on October 31, 2016, but that was to obtain further documentation, collect a signed medical release form, to discuss the safety concerns Complainant raised in his October 19, 2016 email, and to determine if Complainant had considered retirement. Tr. at 849-50; RX 166.

By the time he conducted his first interview of Complainant on August 24, 2016, Captain Davis suspected that Complainant had (1) misused his sick leave benefits, (2) been out of position for his long- and short-call reserve duty, (3) misrepresented his position within Respondent, and (4) misused his non-revenue travel privileges both for himself and a friend. RX

---

[65] Complainant denied that Mr. Foo used this travel for Mr. Foo's business; rather, he used it in connection with his role as the CEO and Board Member for MAP International, a "mission organization." Mr. Foo worked for Map International as a volunteer. Tr. at 249-50. Complainant asserted he initially believed that Mr. Foo could permissibly travel for "leisure" to serve a mission organization. Tr. at 249-52. When Complainant learned that Mr. Foo's use had become an issue, he offered to pay the difference between what Mr. Foo paid and any additional cost that would have been borne by a normal traveler. Tr. at 249, 251.

[66] Despite being a violation of Respondent's policy, Complainant claimed that giving one's login information to companions, spouses, and trusted individuals was an accepted practice at Respondent. Tr. at 247.

[67] RX 152 contains the notes of this first interview. Tr. at 847. During this interview, Complainant discussed the deactivation procedure related to FACH-921. Tr. at 848.

[68] RX 156 contains the notes taken during Captain Davis' second meeting with Complainant. Tr. at 848.

[69] RX 164 contains the notes taken during Captain Davis' third meeting with Complainant.

152-1. After his interviews were complete, Captain Davis presented his findings to Captain Graham, Respondent's Senior Vice President of Flight Operations.[70] Tr. at 858, 988. Captain Graham concluded that because of Complainant's repeated and habitual intentional violation of Respondent's policies and procedures, he could no long trust his judgment. He also found Complainant's integrity in question. Thus, Captain Graham issued to Complainant a Notice of Intent to Terminate on March 13, 2017 (JX 4) and terminated Complainant's employment on April 13, 2017. Tr. at 992-93; JX 5. Captain Davis assisted in drafting the notice of termination for Captain Graham's signature. Tr. at 859. The termination letter states that Complainant's termination was based on (1) his misrepresentation of his position at Respondent for personal gain, (2) his violations of Respondent's non-revenue travel and security policies, (3) repeatedly being out of position for reserve duty and misrepresenting his status to Crew Scheduling, and (4) his violations of Respondent's sick leave policies.[71] JX 5; *see also* RX 230; RX 232. The letter also stated that each of these violations constituted an independent ground for termination. JX 5.

In late August 2016, Complainant drafted a memorandum addressing matters raised during Respondent's investigation into his activities. In this memorandum he states: "My understanding with FAA is they don't *enforce* Military HOS."[72] RX-48-5. When asked if he understood the FAA not to have jurisdiction over the FACH-921, Complainant said:

> The FAA has jurisdiction over my STC installed on this aircraft. There were two separate type certificates involved here . . . . There's the Boeing 737 Type Certificate, that has a Chilean registry, and I understand a Chilean Airworthiness Certificate, but the STC is FAA.

Tr. at 363. Complainant attempted to clarity his statement by commenting that he had "not seen [the FAA] take any enforcement action, but that doesn't mean that they don't provide regulatory guidance and the safety standards for corrective safety action." Tr. at 364.

---

[70] Respondent's damages and mitigation expert, Mr. Glass, testified that proper use of a travel pass is one of the "cardinal rules" in aviation—"when you violate those, you are terminated." Tr. at 915. Mr. Glass asserted that any airline that he has represented would have terminated Complainant for his behavior. Tr. at 915. Specifically:

> It's one of the great privileges and perk that any employee in the United States gets, to be able to travel for either free or a reduced rate. And because that perk, in and of itself, is of such tremendous value, airlines treat it very, very seriously. And in the vast majority of travel pass abuse cases that I've been around, termination is warranted.

Tr. at 916. Captain Graham, Respondent's Chief Pilot at the time of these incidents, concurred with this assessment of the seriousness of an employee's travel pass abuse. Tr. at 979-80.

[71] Complainant testified that, prior to these allegations, in 30 years flying for Western and Respondent he had never been disciplined for or accused of abusing sick leave, the travel pass system, abusing short-call or long-call reserve, or being out of position. Tr. at 195.

[72] The Tribunal understands this to abbreviation to mean Head of State.

## III. ISSUES[73]

- Is Complainant and/or Respondent covered under the Act?
- Did Complainant engage in protected activity?
- Was the protected activity a contributing factor in the unfavorable personnel action?
- In the absence of the protected activity, would Respondent have taken the same adverse action?

### A. Complainant's Position

Complainant essentially argues that the phrase "relating to air carrier safety" at 49 U.S.C. § 42121(a)(1) should be interpreted broadly, and that his reports are protected activity because they fit within the fundamental air safety purpose of AIR 21. Comp. Br. at 17-22. He argues that his protected activity was a contributing factor to Respondent's decision to terminate him, noting that Respondent knew of his protected activity and that Respondent's actions show pretext. Compl. Br. at 30-39. Complainant seeks at least $950,000 in losses plus attorneys' fees. Compl. Br. at 39-42.

In his reply brief Complainant argues that his allegations are not extraterritorial in nature, and the Act and implementing regulations do not require the employee to be acting as an employee to receive the benefits of the Act's protections. Compl. Reply at 1-4. Complainant reiterated that he had a good faith, objectively reasonable belief that FAA violations had occurred. Comply Reply at 6-11. He asserts that Respondent has not established that it would have fired him in the absence of his protected activity because Respondent's investigation is too intimately connected to the beginning of his protected activity. Compl. Reply at 5.

### B. Respondent's Position

Respondent asserts that Complainant's claim is unrelated to air carrier safety. Resp. Br. at 15. It also maintains that Complainant had neither a good faith nor objectively reasonable belief that a violation of federal aviation law had occurred or, even if he had such a belief, his reporting of allege violations was not a contributing factor to his termination. Resp. Br. at 16-36. Respondent argues that, given the serious misconduct involved, it would have terminated Complainant's employment despite any protected activity. Resp. Br. at 38-46.

---

[73] In its response to the Tribunal's Notice of Assignment, Respondent conceded that Complainant's complaint was timely filed and his appeal to the Office of Administrative Law Judges was timely filed. Additionally, at the beginning of the hearing, Respondent conceded that its termination of Complainant's employment was an adverse action. Tr. at 11. Accordingly, the Tribunal finds these elements are established and will not further address them in this decision.

## IV. CONCLUSIONS OF LAW

To prevail on his whistleblower complaint under AIR 21, Complainant bears the initial burden to demonstrate the following elements by a preponderance of the evidence: (1) he engaged in activity protected; (2) Respondent took unfavorable personnel action against him; and (3) the protected activity was a contributing factor in the unfavorable personnel action. *See Occhione v. PSA Airlines, Inc.*, ARB No. 13-061, slip op. at 6 (Nov. 26, 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(iii); 29 C.F.R. § 1979.109(a)). If Complainant establishes this *prima facie* case, the burden shifts to Respondent to demonstrate, by clear and convincing evidence, that it would have taken the same unfavorable action in the absence of the protected activity. *Mizusawa v. United States Dep't of Labor*, 524 F. App'x 443, 446 (10th Cir. 2013) (citing 49 U.S.C. § 42121(b)(2)(B)(iv)).

### A. Credibility

In deciding the issues presented, this Tribunal considered and evaluated the rationality and consistency of the testimony of all witnesses and the manner in which the testimony supports or detracts from other record evidence. In doing so, this Tribunal has taken into account all relevant, probative, and available evidence and attempted to analyze and assess its cumulative impact on the record contentions. *See Frady v. Tennessee Valley Authority*, Case No. 1992-ERA-19 at 4 (Sec'y Oct. 23, 1995).

The ARB has stated its preference that ALJs "delineate the specific credibility determinations for each witness," though it is not required. *Malmanger v. Air Evac EMS, Inc.*, ARB No. 08-071, ALJ No. 2007-AIR-008 (ARB July 2, 2009). In weighing the testimony of witnesses, the ALJ as fact finder may consider the relationship of the witnesses to the parties, the witnesses' interest in the outcome of the proceedings, the witnesses' demeanor while testifying, the witnesses' opportunity to observe or acquire knowledge about the subject matter of the witnesses' testimony, and the extent to which the testimony was supported or contradicted by other credible evidence. *Gary v. Chautauqua Airlines*, ARB No. 04-112, ALJ No. 2003-AIR-038, slip op. at 4 (ARB Jan. 31, 2006). An administrative law judge is not bound to believe or disbelieve the entirety of a witness's testimony, but may choose to believe only certain portions of the testimony. *Johnson v. Rocket City Drywall,* ARB No. 05-131, ALJ No. 2005-STA-024 (Jan 31, 2007); *Altemose Construction Co. v. NLRB*, 514 F.2d 8, 14 n.5 (3d Cir. 1975).

The Tribunal found the testimony of Mr. Kelly and Captain Davis particularly credible. Captain Davis persuasively explained to the Tribunal not only how he conducted his investigation into Complainant's travel activities but why he took the steps that he did during his investigation. The thoroughness of Captain Davis' investigation together with the cogent rationale for his actions merits great weight.

The Tribunal also gives great weight to Mr. Kelly's testimony about how the repairs to FACH-921 occurred and the reasons for Respondent's decisions. Mr. Kelly had the advantage of being aware of the actual maintenance that was performed on the aircraft by looking at

Respondent's manual, the STC manuals provided to it by the CAF, and the task cards that showed the actual work performed.

The Tribunal gives no credit to Complainant's assertion that his email to his Chief Pilot on January 11, 2016 was, in part, to "see if we had any conflict of interest issues that we needed to address." Tr. at 76; CX 3. Nothing in that email remotely connotes an inquiry into whether there was a conflict of interest, but it does disclose that one of his companies was a sole-source provider for an aircraft currently at RTOD. The email mentions a $100,000 profit potential for Respondent ("DAL") but omits that Complainant's company may profit as well. Nor does he mention that his "trek to ATL" was going to be through the use of a jumpseat pass or other pass provided by Respondent to its employees. The "spin" of this email clearly communicates the benefits to Respondent and makes little mention of the benefits Complainant or his company might receive in return. The Tribunal sees nothing in his email that would alert a manager of the extent of Complainant's involvement in RTOD or the manner in which he intended to use his travel privileges.

B. Complainant's *Prima Facie* Case

1. Covered Employer

The whistleblower protections of AIR 21 prohibit any "air carrier or contractor or subcontractor of an air carrier" from discharging or discriminating against any employee on the basis of the employee's protected activity. 49 U.S.C. § 42121(a). "Air carrier" is defined in 49 U.S.C. § 40102(a) as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation."[74] "Air transportation," is in turn defined as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft." 49 U.S.C. § 40102(a)(5). Foreign air transportation is "the transportation of passengers or property by aircraft as a common carrier for compensation . . . between a place in the United States and a place outside the United States when any part of the transportation is by aircraft." 49 U.S.C. § 40102(a)(23). And interstate air transportation is "the transportation of passengers or property by aircraft as a common carrier for compensation" between states or territories of the United States. 49 U.S.C. § 40102(a)(25).

Respondent is unquestionably an air carrier under AIR 21 because it holds a Part 121 certificate and provides interstate and foreign air transportation.[75] Further, the aircraft maintenance that Respondent performs under its Part 145 repair station certificate is a "safety-sensitive function." *See* 29 C.F.R. § 1979.101. Therefore, the Tribunal finds that Respondent is subject to the Act.

---

[74] Respondent does not argue that it is not a citizen of the United States, and the evidence of record establishes that Respondent is a "citizen of the United States" as the Act defines that phrase.

[75] According to its website, Respondent offers service to 304 destinations in 52 countries and operates more than 800 aircraft utilizing about 80,000 employees. *See* https://news.delta.com/corporate-stats-and-facts.

2. Covered Employee

AIR 21 extends whistleblower protection to employees in the air carrier industry who engage in protected activity. The governing regulations define the term "employee" as:

> . . . an individual presently or formerly working for an air carrier or contractor or subcontractor of an air carrier, an individual applying to work for an air carrier or contractor or subcontractor of an air carrier, or an individual whose employment *could be affected* by an air carrier or contractor or subcontractor of an air carrier.

29 C.F.R. § 1979.101 (emphasis added).

Here, Complainant worked for Respondent as a pilot operating aircraft under Part 121. In this capacity, there can be little doubt that he is a covered employee. However, Complainant in this case wore two hats; he was a pilot for Respondent and he was the owner of company that was conducting business with Respondent separate and apart from his status as an employee. In other words, he was attempting to be a contractor.[76] As the DAH holder for the auxiliary fuel cell STC installed on to FACH-921 where maintenance was being performed on that STC equipment, there existed a relationship arguably mandated by the FAA. As a DAH, his company had certain affirmative duties towards any person that had permission to use its STC. *See* 14 C.F.R. Part 21, subpart E. However, here that relationship would exist with the Chilean Government and not necessarily Respondent. Respondent's relationship to Complainant as the DAH holder was only indirect and due to its performance of maintenance at the request of the Chilean Government.

Complainant cites to the definition of "employee" in 29 C.F.R. § 179.101, arguing that Complainant was "an individual presently or formerly working for an air carrier or contractor or subcontractor of an air carrier" and "an individual whose employment could be affected by an air carrier" vis-à-vis Respondent. Compl. Br. at 23. He notes that the Board interprets the term "employee" broadly, citing to *Peck v. Safe Air Int'l Inc. d/b/a Island Express,* 2004 DOL Ad. Rev. Bd LEXIS 10, at 28-30.

The Tribunal agrees that Complainant is an "employee" under the Act. First, neither the language of the Act nor the implementing regulations contain any scope of employment criteria for an individual to be covered as an "employee" under the Act. The various types of protected activity listed at 49 U.S.C. § 42121(a) do not specify that such activity be conducted during times that an individual is performing the duties of an employee, or that such activity occur while the individual is "on the clock." Similarly, the Act contains no requirement that an individual's protected activity have any connection to his employer's business. An individual's reporting of or participation in any proceeding related to an alleged violation of federal aviation law is protected regardless of whether those activities have a nexus to the employer. In other words,

[76] During Respondent's opening, she referred to Complainant—during his January 22 visit to the RTOD—as a vendor. Tr. at 39. The hearing evidence establishes that Complainant never formally entered into a contractor relationship with Respondent or the CAF. Tr. at 171-72, 330, 547-49, 566.

the Act prohibits an air carrier from firing its employees because they engaged in protected activities regarding other air carriers. Accordingly, it would be contrary to the structure of the AIR 21 to find that an individual is an "employee" only when he engages in protected activity within the scope of his duties for the air carrier.[77]

Second, the regulation includes individuals who never worked for an air carrier within the definition of "employees." Any individual who has merely applied for employment with an air carrier or whose employment "*could be affected* by an air carrier" is considered an "employee" under 29 C.F.R. § 1979.101. Inclusion of such individuals within the definition of "employee" clearly indicates that the protections afforded by the Act do not end when an individual ceases performing official duties for an air carrier.

For the above reasons, the Tribunal finds that Complainant was a covered employee for purposes of the Act. However, there is a difference between an employee as defined in 29 C.F.R. § 1979.101 and a *protected* employee under 29 C.F.R. § 1979.102(b).

1. Protected Activity

Under the Act, no air carrier, or contractor or subcontractor of an air carrier, may discriminate against an employee because the employee:

> (1) provided, caused to be provided, or is about to provide (with any knowledge of the employer) or cause to be provided to the employer or Federal Government information relating to any violation or alleged violation of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal law relating to air carrier safety under this subtitle or any other law of the United States;
> (2) has filed, caused to be filed, or is about to file (with any knowledge of the employer) or cause to be filed a proceeding relating to any violation or alleged violation of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal law relating to air carrier safety under this subtitle or any other law of the United States;
> (3) testified or is about to testify in such a proceeding; or
> (4) assisted or participated or is about to assist or participate in such a proceeding.

---

[77] The Tribunal finds it hard to believe that Congress intended FAA certificate holders to be protected for reporting safety violations only when they are on duty. Such a holding would cause a chilling effect in timely reporting of legitimate air carrier safety related issues and potentially result an employee delaying reporting of a legitimate safety concerns until they are on duty, or only reporting safety issues while actually on duty. If an experienced captain were to observe an unsafe act on a flight while he is riding as a passenger, it would be unreasonable not to protect her for making a prompt safety report. The overarching purpose of the Act is to protect employees that report safety related concerns. *Cobb v. FedEx Corp. Svcs.*, ARB Case No. 12-052, ALJ 2010-AIR-24, slip op. at 12 (Dec. 13, 2013). To limit protections to only when an employee was acting as an employee or in their capacity as an employee runs counter to underlying objective of obtaining the highest level of safety in air commerce. It should matter not whether an employee is on the clock at the time of the report.

49 U.S.C. § 42121(a)(1)-(4).

The Board has explained, "As a matter law, an employee engages in protected activity any time [h]e provides or attempts to provide information related to a violation or alleged violation of an FAA requirement or any federal law related to air carrier safety, where the employee's belief of a violation is subjectively and objectively reasonable." *Sewade v. Halo-Flight, Inc.*, ARB No. 13-098, slip op. at 7-8 (Feb. 13, 2015) (citing 49 U.S.C. § 42121(a)(1)) (emphasizing that "an employee need not prove an *actual* FAA violation to satisfy the protected activity requirement") (emphasis in original)). Thus, the "complainant must prove that he reasonably believed in the existence of a violation," which entails both a subjective and an objective component. *Burdette v. ExpressJet Airlines, Inc.*, ARB No. 14-059, slip op. at 5 (Jan. 21, 2016). To prove subjective belief, a complainant must show that he "held the belief in good faith." *Id.* To determine whether a complainant's subjective belief is objectively reasonable, an ALJ must assess his belief "taking into account the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.* (internal quotation marks omitted) (evaluating the reasonableness of a pilot's belief in light of his training and experience).

Though the complainant "need not cite to a specific violation, his complaint must at least relate to violations of FAA orders, regulations, or standards (or any other violations of federal law relating to air carrier safety)." *Malmanger v. Air Evac EMS, Inc.*, ARB No. 08-071, slip op. at 9 (July 2, 2009).

Discussion of Protected Activity

Complainant asserts that his communications with Respondent and the FAA constituted protected activity because they stemmed from his reasonable belief that Respondent's actions violated 14 C.F.R. § 21.113, concerning changes to the FACH-921's type design. Compl. Br. at 17-22. Major changes in type design without receipt of an STC or other acceptable means of compliance would be a violation of FAA regulations. 14 C.F.R. § 21.113. According to Complainant's hearing testimony, Respondent did not have the approved technical data or data acceptable to FAA to do the work it performed on the auxiliary fuel system of FACH-921. Tr. at 94-95.

Specifically, Complainant asserts that, because the STC and the auxiliary fuel system's maintenance manual do not provide for a deactivated auxiliary fuel system in flight, Respondent's and CAF's deactivation of the system was a major change in type design. Since neither Respondent nor CAF applied for or obtained an STC, Complainant asserts that he reasonably believed that their maintenance work on the FACH-921 violated 14 C.F.R. § 21.113(b). Compl. Br. at 22. However, for a number of reasons, the Tribunal finds that Complainant's communications with Respondent and the FAA do not constitute protected activity.

a. The Information Complainant Provided to Respondent and the FAA

The evidence shows that Respondent initially reached out to Complainant on January 15, 2016 regarding two dents found in the auxiliary fuel tanks on FACH-921, because Complainant's company (ASE) was the DAH of the STC used to install the auxiliary fuel tanks on this aircraft. CX 8 at 4. Respondent sent pictures and skin map plots of the damaged tanks to ASE for review, and asked Complainant to advise Respondent on how to proceed. *Id.*

Complainant responded by proposing four service bulletins, and "highly recommended" that the operator elect to engage service bulletin related to over-pressurization of fuel cells. CX 8 at 2; *see also* Tr. at 73. On January 20, a representative from the Chilean Air Force, Jorge Cardenas emailed Complainant, stating that CAF only needed ASE to obtain the instructions to repair the fuel tank dents and 10-PSI valve. CX 20 at 1. However, when Complainant sent quotes to Mr. Cardenas later that day, he provided three sets of quotes. CX 24 at 2-4; Tr. at 93-94. Complainant explained at the hearing that the first quote option was simply time and materials to fix the dents and 10-PSI valve, the second was a complete diagnostic of the fuel system, and the third included the damage tolerance inspections that ASE was required by the FAA to provide to operators for continued airworthiness. Tr. at 94-95.

Mr. Cardenas replied on January 20, telling Complainant that CAF needed resolution on whether the dents would be acceptable or repairable. CX 30. He stated that CAF was not interested in incorporating ASE's proposed service bulletins at that time. CX 30. Complainant responded, providing Mr. Cardenas with ten "points to consider." CX 32; Tr. at 96-97. Most of these points related to the details of ASE's proposed service bulletins, including Complainant's assertions that such work would benefit CAF. In this email, Complainant also stated that: the "FAA indicates the CDCCLs are Maintenance Significant Items," "05 ASL 14 Pressure Relieve failure is an unsafe condition that may affect the 3-tank group," and the "FAA remains firm on fuel tank safety." CX 32 at 1. Though Complainant sent this email to Mr. Cardenas, he cc'd a number of Respondent employees on it. *Id.*

Later that day, Complainant also emailed a number of Respondent's employees directly, noting his additional concern that tank wall damage occurring on removal and replacement of the pressure relief valve. He stated: "the controlling AWL (unsafe condition) is 05 AWL 04 and bonded skin condition of the near and far-side panels of the fuel cell group." CX 34. In a January 21 email to Respondent, Complainant asserted that ASE was "limited by FAA mandatory understandings and PATS willingness to sustain from tank life limits." CX 45. He noted that a deactivation service bulletin would take about four weeks to obtain, and that ASE should be able to complete a service bulletin for return to service in ten working days. Complainant also stated: "For ASE on behalf of our STSC holders we are limited on 'outside of the box' solutions for RTS. Like DAL, ASE holds hi [sic] standards and regards AASR/EAPAS - FTS as critical to air safety." *Id.*

On January 22, Complainant arrived in Atlanta for a visit to TechOps. Tr. at 107. Complainant met with RTOD personnel and presented detailed information to CAF personnel about the airworthiness limitations for the auxiliary fuel system, asserting that the STC

limitations section of the maintenance manual for the aircraft was mandatory. Tr. at 120-51; CX 354; JX 11. According to Complainant, after this meeting RTOD personnel quit communicating with him about FACH-921. Tr. at 481; *see also* Tr. at 710. In fact, Mr. Cardenas wrote to Complainant on January 22, telling him that the CAF had analyzed Complainant's proposals and declined to go forward with them. CX 67.

Despite the CAF's declination of ASE's proposed services, Complainant continued his email correspondence with Respondent and the CAF. Among other emails, Complainant wrote to Respondent on February 2, 2016, telling its representatives that the deactivation of the auxiliary fuel cell is a major change to the product design. CX 141; Tr. at 426. Thus, Complainant asserted that at the time he believed Respondent had probably violated the Federal Aviation Regulations by releasing the airplane. Tr. at 410-11; RX 4 at 5.

Complainant also communicated with the FAA during this period regarding these issues. On January 18, Complainant called the FAA and told Mr. David Lee about the failed 10-PSI relief valve. Tr. at 174. Complainant believed that he was required to report this information under FAR 21.3. Tr. at 175. About a week later, Complainant met with multiple FAA representatives in person and proposed a temporary revision to the flight manual supplement to address deactivation of the auxiliary fuel system and allow the Chileans to fly FACH-921 out of Atlanta. Tr. at 175-76. Complainant testified that he believed FAA approval was needed for the deactivation because it was a major design change to the STC. Tr. at 177. According to Complainant, one FAA representative commented that the FAA could usually approve deactivations quickly. *Id.*

Complainant also testified that Mr. Lee called him back after this meeting, telling Complainant that that "I've pulled everything back on these deactivations tanks and we need to see it. No DER approval. DER is going to recommend, under the 81.10-3 form, certainly we'll look at that and it can probably be more expeditious, but we're going to retain the approval rights for the deactivation of that STC." Tr. at 178. Complainant asserted that he believed this communication to indicate that revision of the flight manual for deactivation required FAA approval, which he communicated to Respondent via email on February 1 and 2. Tr. at 177-80; CX 133; CX 141.

After this email, Complainant testified that Respondent ceased communicating with him. Tr. at 180. It was at this point that Complainant "knew, probably, the safety solution was a deactivation." *Id.*

b. <u>Whether FAA Rules Applied to Respondent's Work on the FACH 921</u>

At the outset, the Tribunal is faced with an issue of first impression. Complainant asserts that his reporting of potential violations of 14 C.F.R. § 21.113 in relation to Respondent's maintenance on a foreign state-owned aircraft was protected activity. A threshold question thus becomes: Did 14 C.F.R. § 21.113 apply to Respondent's maintenance work on FACH-921?[78]

[78] In its brief, Respondent raises the issue of extraterritoriality. Resp. Br. at 16-17. The Tribunal agrees that the Act's provisions do not apply extraterritorially. *Shi v. Moog Inc.*, ALJ No. 2016-AIR-00020, slip

The Tribunal finds under the facts here that the answer is no, because the FAA lacks authority to regulate the maintenance performed on such aircraft. The Tribunal explains its reasoning below.

As FACH-921 is a foreign state aircraft, some discussion about international aviation law is needed to explain what regulatory body has authority over the airworthiness of this aircraft and, in turn, whether 14 C.F.R. § 21.113 was applicable to Respondent's work on FACH-921.

Under the Convention on International Aviation (Chicago Convention),[79] all civil aircraft must be registered with a national aviation authority.[80] Every country, even those that are not signatories to the Convention, has a National Aviation Authority to register civil aircraft. And an aircraft can only be registered with one nation at a time. *See* Chicago Convention, Art. 17, 20, 29. Every aircraft must display a unique marking that indicates its nationality. Chicago Convention, Art. 20, Annex 7. For military aircraft, most nations use tail codes and serial numbers and are not normally assigned civil registration code. The nationality of aircraft is significant for it dictates what regulations the owner must follow.

The Chicago Convention led to the establishment of the International Civil Aviation Organization ("ICAO") whose goal is to "develop the principles and techniques of international air navigation, and to foster the planning and development of air transport."[81] The ICAO council's duties include adoption of international standards and recommended practices, which are in turn incorporated into one of the 18 annexes to the Chicago Convention.[82]

---

op. at 21-26 (Aug. 18, 2017) (concluding that the whistleblower provisions of AIR 21 were intended only to apply to the domestic aviation system); *see also Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 248 (2010); *Villanueva v. Core Laboratories NV*, ARB Case No. 09-018, slip op. at 10 (Dec. 22, 2011), *aff'd, Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103 (5th Cir. 2014). However, Complainant's allegations do not present issues of extraterritorial application. Though FACH-921 is a foreign military aircraft that does not operate inside the United States, its maintenance was performed in the U.S. by a U.S. corporation that holds U.S. air carrier and repair station certificates. And the alleged FAA violations, protected activity, and retaliatory adverse actions occurred in the U.S. Accordingly, the Tribunal finds that it does not lack subject matter jurisdiction over Complainant's case due to any potential extraterritorial application of AIR 21's whistleblower provisions.

[79] Convention Between the United States of American and Other Governments Respecting International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295, available at http://www.icao.int/icaonet/arch/doc/7300/7300 orig.pdf.

[80] Articles 1 and 11, as well as the Preamble to the Chicago Convention, illustrate a theme of independent state sovereignty within the larger field of civil aeronautics law. For example, the Preamble states that the purpose of the Chicago Convention is to ensure that international civil aviation "may be developed in a safe and orderly manner and that international air transport services may be established on the basis of equality of opportunity . . . ." Convention on International Civil Aviation Done at Chicago on the 7th Day of December 1994, http://www.icao.int/publications/Documents/7300_orig.pdf.

[81] *See* Shirlyce Manning, *The United States' Response to International Air Safety*, 61 J. OF AIR LAW & COMM. 505, 511 n.28 (1995), available at https://scholar.smu.edu/jalc/vol61/iss2/7/.

[82] Mark Lee Morrison, *Navigating the Tumultuous Skies of International Aviation: The Federal Aviation Administration's Response to Non-compliance with International Safety Standards*, SOUTHWESTERN J. OF LAW AND TRADE IN THE AMERICAS, 621, 630 (1970).

The Federal Aviation Regulations ("FAR") are consistent with this concept.[83] Part 129 of the FARs assumes the existence of competent civil aviation authorities where a particular foreign air carrier is based, and thus requires that the air carrier comply with the criteria in Part 1 of Annex 6 to Chicago convention and maintain its aircraft in an airworthy condition as set forth in Annex 8.[84] 14 C.F.R. § 129.5(b). Furthermore, "the judgment of a country of registry that an aircraft is airworthy must be respected unless the country of registry is not observing the 'minimum standards'" set forth in Annex 8 to the Chicago Convention. *British Caledonian Airways, Ltd. v. Bond,* 665 F.2d 1153, 1160 (D.C. Cir. (1981).[85] Those minimum standards are set forth in Article 33 and specifically provided for in Article 37. *Id.* The *Bond* court also recognized "multilateral and bilateral agreements intend the states of registry to resolve questions of safety and continuing airworthiness that may arise after the original airworthiness and type certificates were issued." *Id.* at 1165. Thus, in the context of foreign civil aircraft, deference is given to the airworthiness determination by the nation of registry. And here, that determination was made by the Chilean officials when they authorized Respondent to deactivate the auxiliary fuel cell and the aircraft was approved for return to service. Tr. at 397-98, 432-33.

Additionally, federal courts follow the express language in Article 3(b) of the Convention and have limited the applicability of the Convention to civil aircraft. *See, e.g., Korean Airlines Disaster*, 597 F.Supp. 619, 620 (D.D.C. 1984). In other words, the Convention does not apply to state aircraft, such as those used by a foreign military. *Id.* Although FACH-921 is a Boeing 737-500, an aircraft often used in commercial passenger flights, that does not make the FACH-921 a civil aircraft.[86] The unrebutted testimony shows that this aircraft was used by the CAF for non-commercial purposes; specifically, as a Chilean military aircraft for its Head of State. Tr. at 229, 312, 364, 529; RX 16. Given the undisputed facts presented, this Tribunal finds that this aircraft is a "state aircraft" under international law. *See Chicago Convention,* Art. 3(b).[87]

---

[83] *See, e.g.,* 14 C.F.R. § 91.703 (requiring U.S. registered aircraft operated outside of the United States to comply with the regulations relating to the flight and maneuvering of aircraft in force within that foreign country).

[84] *See* ICAO Doc. 9760 AN/967, *Airworthiness Manual* (3d ed. 2014), available at http://dgca.gov.in/intradgca/intra/icaodocs/9760_cons_en.pdf.

[85] *See* FAA interpretation letter by Rebecca MacPherson, AGC-200 to U.S. E.P.A (Aug. 25, 2011) ("The FAA [lacks] jurisdiction to mandate changes to the maintenance program of a foreign registered aircraft operated by a foreign air carrier."), available at https://www.faa.gov/about/office_org/headquarters_offices/agc/practice_areas/regulations/interpretations/data/interps/2011/eisenberg-epa%20-%20(2011)%20legal%20interpretation.pdf.

[86] Head of state aircraft operated by governmental entities frequently have extensive modifications to them. The FAA considers such aircraft "Commercial Derivative Aircraft." *See* AC 20-169, *Guidance for Certification of Military and Special Mission Modifications and Equipment for Commercial Derivative Aircraft (CDA)* (Sept. 30, 2010), available at https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_20-169.pdf. *See also* CX 337 which contains FAA Order 8110.101A, *type Certification Procedures for Military Commercial Derivative Aircraft* (Feb. 25, 2015). *See generally,* GAO Report, GAO-16-329SP (Mar. 31, 2016) (recognizing replacement of the Air Force One fleet would occur using a commercial derivative aircraft).

[87] The factors to consider when determining if an aircraft is a "state aircraft" are: i) nature of the cargo carried; ii) ownership of the aircraft; iii) type of operation; iv) passengers or personnel carried; v) aircraft registration and national markings; vi) potential secrecy of the flight; vii) customs clearances; viii)

Based on this determination, the Tribunal also finds that, as a matter of law, 14 C.F.R. § 21.113 did not apply to Respondent's maintenance work on FACH-921. First, most FAA regulations do not apply to domestic public use aircraft, let alone foreign military aircraft.[88] The FAA recognizes that it lacks authority over foreign military aircraft:

> The FAA is not chartered for certification of products modified for use by a foreign military government. However, to support the U.S. aviation industry, the FAA may accept applications for these projects on a case-by-case basis considering the burden imposed on its primary U.S. safety mission responsibility. *The FAA considers these aircraft to have no U.S. civil aviation application and, therefore, do not represent an impact on the safety of the U.S. civil aviation system.*

FAA Memorandum by Manager, Certification Programs Branch, AIR-110, *Foreign Military Certification Procedures* (Sept. 30, 2004) (emphasis added).

Second, FAA repair station regulations do not apply to maintenance performed on foreign military aircraft. Ordinarily, "[a] certified repair station may not approve for return to service any article after a major repair or major alteration unless the major repair or major alteration was performed in accordance with applicable approved technical data." 14 C.F.R. § 145.201(a). However, the provisions of Part 145 only apply when a repair station performs "maintenance, preventive maintenance, or alterations . . . to which part 43 applies." 14 C.F.R. § 145.1. Part 43 provides:

> <u>§ 43.1 Applicability</u>
> (a) Except as provided in paragraphs (b) and (d) of this section, this part prescribes rules governing the maintenance, preventive maintenance, rebuilding, and alteration of any--
> **(1) Aircraft having a U.S. airworthiness certificate;**
> **(2) Foreign-registered civil aircraft used in common carriage or carriage of mail under the provisions of Part 121 or 135 of this chapter;** and
> (3) Airframe, aircraft engines, propellers, appliances, and component parts of such aircraft.

---

documentation; and ix) type of crew. *See* Int'l Civil Aviation Org., Agenda Item 2: Report of the Secretariat: Secretariat Study on "Civil/State Aircraft" 14 (ICAO, Report No. LC/29-WP/2-1, 1994) (describing observations and doubts regarding aircraft status under the Chicago Convention).

[88] *See* 49 U.S.C. §§ 40125, 40102(a)(41); *Appeal of McDonnell Douglas Corporation,* 99-1 B.C.A. (CCH) P30,152, 149,187-88 (A.S.B.C.A. 1998). However, FAA regulations do apply when a foreign civil aircraft is navigating in U.S. national airspace. 14 C.F.R. § 91.711.

14 C.F.R. § 43.1(a) (emphasis added).[89]

No evidence has been presented that FACH-921 possesses a U.S. airworthiness certificate. A FAA standard airworthiness certificate is the FAA's official authorization allowing for the operation of type-certificated aircraft in certain categories; for this aircraft it would be a transport category certificate.[90] Granted, FACH-921 may have at one point held a U.S. airworthiness certificate when it left the assembly line in the United States,[91] but the airworthiness certificate need only be a U.S. airworthiness certificate if it was registered in the United States. *See* 14 C.F.R. § 47.3. No evidence has been presented that this foreign aircraft is registered with civil authorities in Chile or any other foreign state. The evidence here establishes that the aircraft is owned and operated by the Chilean Air Force. Even assuming, *arguendo,* that Chilean military aircraft are placed on the Chilean civil aircraft registry, the record contains no evidence that FACH-921 is used in common carriage or carriage of mail *under the provisions of Part 121 or 135.*

For these reasons, the Tribunal finds that FAA repair station regulations did not apply to Respondent's maintenance work on FACH-921.[92] Respondent therefore did not violate 14 C.F.R. § 21.113 by failing to obtain a DAH approved procedure STC prior to deactivating the auxiliary fuel system.[93] Nevertheless, as "an employee need not prove an *actual* FAA violation to satisfy the protected activity requirement," such a finding does not conclusively demonstrate that Complainant's reporting was not protected under the Act. *Sewade v. Halo-Flight, Inc.*, ARB No. 13-098, slip op. at 7-8 (Feb. 13, 2015). Rather, Complainant need only show that he held a good faith, objectively reasonable belief in the existence of such a violation. *Burdette v.*

[89] Subsections (b) and (d) provide exceptions for aircraft issued either an FAA experimental certificate or a light-sport category certificate; neither situation applies here.

[90] Transport airplanes are airplanes for which a type certificate is applied for under 14 C.F.R. Part 21 in the transport category and that meet the transport category airworthiness requirements. Multi-engine airplanes with more than 19 seats or a maximum takeoff weight greater than 19,000 lbs must be certificated in the transport category. *See* 14 C.F.R. Part 25.

[91] Per 21 C.F.R. §21.183(a), a new aircraft manufactured under a production certificate is entitled to a standard airworthiness certificate without further showing.

[92] Whether or not the Chilean Government chose to follow the Supplemental Type Certificate requirements for this aircraft goes to the marketability of that aircraft in any future sale. This Tribunal concludes that the FAA does not have jurisdiction to certify products modified for use by a foreign military government, but would have jurisdiction if someday someone attempted to register this aircraft in the United States or was to be used by U.S. air carrier. At that point a conformity inspection would be required and any unauthorized deviations from the Type Design or altered condition would be addressed at that time to place it in compliance with U.S. regulations. The Tribunal suspects that it is for this reason the FAA recommends use of the following language when a STC is installed on a foreign military aircraft: "This aircraft is certified only for use by a foreign military government. This aircraft is not eligible for U.S. airworthiness certification without re-evaluation per 14 C.F.R. § 21.101." *See* FAA Memorandum, AIR-110, *Foreign Military Certification Procedures* (Sept. 30, 2004).

[93] The undersigned notes that since Part 43 does not apply to the maintenance performed on FACH-921, it was eminently reasonable for the repair station to turn to the aircraft's owner for instructions on how to perform maintenance. The FAA Master Minimum Equipment List for the Boeing 737 provides that the auxiliary fuel system can be inoperative, provided the tanks remain empty. RX 135.

*ExpressJet Airlines, Inc.*, ARB No. 14-059, slip op. at 5 (Jan. 21, 2016). To this issue, the Tribunal now turns.

c. Whether Complainant had a Good Faith, Objectively Reasonable Belief in the Existence of a Violation of FAA Rules

As a starting point, the Tribunal agrees with Complainant that major changes in type design without receipt of an STC or other acceptable means of compliance would be a violation if FAA repair station regulations applied. *See* 14 C.F.R. § 21.113. And, as noted above, he communicated his views regarding a lack of FAA-approved deactivation procedures to Respondent in January and February of 2016. Specifically, Complainant expressed his opinion that deactivation of the FACH-921's auxiliary fuel tanks would be a major change in type design, for which no FAA Service Bulletins had been issued when the tanks were installed in configuration #2. *See, e.g.*, CX 141. He also expressed his opinion that the FACH-921's aircraft manual required certain types of maintenance on the auxiliary fuel system. *See, e.g.*, CX 34.

Though the undersigned has determined that FAA repair station regulations did not apply to Respondent's work on the FACH-921, the Tribunal finds reasonable Complainant's belief that they did. For one, this situation is uniquely complex. The FACH-921 had—at some point—received FAA approval to install the auxiliary fuel system by use of STC, number ST01337NY-D. In Complainant's words, this was a "one-off STC, with a PMA" installed only on Chilean Air Force aircraft. Tr. at 148. That an owner of FACH-921 had received FAA's approval to install this STC on to this aircraft in the past suggests that the FAA had jurisdiction over the airworthiness of this aircraft at some point.[94] PATS Aircraft LLC, the DAH prior to ASE, had received FAA approval for this STC, including the Aircraft Maintenance Manual Supplement TO-632. *Id.* And ASE had purchased the STC that had been installed on the FACH-921 from PATS Aircraft. In Complainant's view, therefore, ASE was still required, as the DAH, to report failures, malfunctions, and defects of STC parts to the FAA under FAR 21.3. Tr. at 175, 359. And Complainant also believed that the FAA would fine ASE $10,000 per day if it did not bring 24 of these STCs into compliance. Tr. at 60-61, 135.

Based on the ongoing obligations that ASE had toward the auxiliary fuel system STC, it was not unreasonable for Complainant to believe that the FAA retained jurisdiction over the STC installed on FACH-921, despite the fact that it was a foreign military aircraft. Respondent, a Part 145 repair station, had reached out to ASE as the DAH for maintenance services in connection with the STC installed on the FACH-921. Thus, in all respects the FAA would have had jurisdiction over this STC maintenance, but for the fact that FACH-921 did not, at the time it was being repaired by Respondent in Atlanta, satisfy the requirements of 14 C.F.R. § 43.1(a). In light of this complexity, the undersigned finds that Complainant reasonably—though mistakenly—believed that the mandatory limitation section of the STC applied to Respondent's maintenance

[94] Evidence of whether FACH-921 was ever a U.S. registered aircraft could be obtained thru the FAA Aircraft Registration Branch if provided the aircraft's serial number. However, neither party provided the aircraft registry information to the Tribunal. *See* https://registry.faa.gov/aircraftinquiry/.

work on the FACH-921, regardless of its current status as a foreign military aircraft. *See* Tr. at 350; CX 340.

However, the Tribunal also finds that, assuming the FARs had applied, Complainant did not have an objectively reasonable belief in the likelihood that Respondent's maintenance would violate 14 C.F.R. § 21.113. At the time he apprised Respondent of controlling Airworthiness Limitations and the necessity of obtaining a Service Bulletin for deactivation, Complainant knew that maintenance would be performed on the auxiliary fuel system. He apprised Respondent of the two options that he believed the STC and chapter 5 of the Aircraft Maintenance Manual afforded to Tech Ops and CAF: flying with the tanks functional or deactivated. Tr. at 171-72, 546; *see also* CX 34 ("the controlling AWL (unsafe condition) is 05 AWL 04"); CX 141 (telling Respondent that deactivation of the auxiliary fuel cell is a major change to the product design).

These circumstances did not provide a reasonable basis for Complainant to believe that Respondent would violate any federal aviation law. Complainant acknowledged at the hearing that the CAF could have gone to a number of providers or engineering firms to perform required maintenance on the FACH-921, or could have performed it themselves if they had the capability. Tr. at 325. Complainant also acknowledged that the CAF could have received an FAA-approved deactivation procedure from another source. Tr. at 328-29, 357, 397, 543-44. And though he knew the CAF wanted to fly FACH-921 out of Atlanta with the auxiliary fuel tanks in the aircraft, Complainant admitted that the CAF could have flown out of Atlanta with the tanks removed. Tr. at 547.

At the hearing, Complainant attempted to construe his February 1 email to Respondent as informing Respondent that it had probably violated the FARs by releasing the airplane without approved data. Tr. at 403-04. Complainant stated that he assumed Respondent used AMMS deactivation, based on the circumstances. Tr. at 405-06. Nevertheless, he admitted that the FACH-921 did not leave Respondent's Atlanta facility until March 2016, and that he was not aware of any of the maintenance that Respondent performed during that period. Tr. at 324-25. Thus, at the time of his communications with Respondent in January and February 2016, Complainant had no objectively reasonable basis to believe that Respondent's maintenance on the FACH-921 would run afoul of any FAA requirements.[95]

For all these reasons, the Tribunal finds that Complainant's provision of compliance information to Respondent in January and February of 2016 regarding FACH-921 maintenance did not constitute "information relating to any violation or alleged violation" of federal aviation law. *See* 49 U.S.C. § 42121(a)(1). At most, Complainant emails and presentation presented a number of maintenance options that he believed would have kept FACH-921 in compliance with FAA regulations, but was simultaneously a sales pitch for the CAF to use his company's services for that maintenance. In these circumstances, particularly where Complainant had no knowledge of what maintenance Respondent would perform after the CAF declined his company's services,

---

[95] Based on what he received in discovery, Complainant asserted that Respondent "skipped steps" and "didn't do all the procedures." Tr. at 409-11. However, this information has no relevance to whether Complainant had an objectively reasonable belief in the existence of a violation at the time he allegedly reported it.

the undersigned finds that Complainant's emails and presentation were not protected activity. Even if they could be construed as constituting "information relating to any violation or alleged violation" of federal aviation law, the Tribunal finds that Complainant did not have an objectively reasonable basis for believing that such a violation was imminent or even likely.

Similarly, the Tribunal finds that Complainant's communications with the FAA in January and February 2016 were not protected activity. Complainant informed the FAA about the failed 10-PSI valve and began the process of obtaining a deactivation Service Bulletin, but never reported any alleged violation of Federal aviation law by Respondent. Tr. at 174-77, 384. Thus, these communications also fail to constitute information related to any alleged violation of FAA maintenance regulations.

Complainant has also failed to establish that his communications with Respondent in August 2016 and January 2017 about FACH-921 maintenance issues were protected activities. After Captain Johnson informed Complainant that he needed to bring his logbooks and travel records to meeting in August 2016—the purpose of which was not disclosed—Complainant emailed Captain Johnson about his concerns that Respondent may have improperly deactivated the auxiliary fuel system.[96] Tr. at 192-93; CX 203; RX 9-1. Complainant subsequently had a conversation with Respondent's general manager of Regulatory Compliance, Mr. Tim Bishop, in January 2017, after Mr. Bishop had been assigned by Respondent to look into Complainant's concerns. Tr. at 196-97, 925. Complainant reiterated his concerns to Mr. Bishop, who informed Complainant that his concerns might be relevant to the operator if the FARs were applicable, but that the CAF was not subject to FAA regulations. RX-209-1. Again, assuming that Complainant's belief that the FARs applied up until this point was reasonable, Complainant has failed to establish that his belief in the existence of an actual violation was reasonable. Complainant did not testify that he learned anything new about the maintenance that Respondent performed on FACH-921 after Tech Ops and the CAF stopped communicating with him in February 2016.[97] Thus, by August 2016 and January 2017 he still did not have an objectively reasonable basis to conclude that Respondent violated any FAA maintenance regulation.

In sum, the Tribunal finds that it was not objectively reasonable for Complainant to believe that the maintenance performed on FACH-921 violated 14 C.F.R. § 21.113. Accordingly, the Tribunal finds that Complainant did not engage in any protected activity when communicating with Respondent or the FAA.

---

[96] Complainant first contacts Flight Ops in August 2016 to notify them that there may be a safety concern with FACH-921. RX 9-1; Tr. at 225-29. Complainant testified that he had raised this concern with "appropriate authorities," and that he felt he had been delegated by Flight Ops to deal with Tech Ops. Tr. at 228. He admitted that he did not raise any safety of flight issues with CAF after FACH-921 left Tech Ops. Tr. at 229.

[97] Complainant testified that CAF cancelled its order for the 10-PSI valve, and stated that this led him to believe that deactivation was the likely course of action that Respondent took. Tr. at 180. However, Complainant did not explain why this information would have allowed him to infer that deactivation was the only option left on the table for Respondent. And Complainant later admitted that CAF could have flown FACH-921 out of Atlanta with the tanks removed. Tr. at 547.

Having failed to establish that he engaged in protected activity, the Tribunal finds that Complainant was not an employee protected by the Act. On this basis alone, Complainant's complaint should be dismissed. However, given the unique facts involved here, the Tribunal will continue its analysis should this finding be viewed as erroneous.

2. Adverse Action

Respondent concedes that its termination of Complainant's employment was an adverse action. The Act lists "discharge" as an adverse action (49 U.S.C. § 42121(a)); thus, Complainant has established the element of adverse action.

3. Contributing Factor Analysis

Complainant successfully established that Respondent committed an adverse action by terminating his employment. Accordingly, the Tribunal must determine whether Complainant's protected activity was a contributing factor in that unfavorable personnel action. *See* 49 U.S.C. § 42121(b)(2)(B)(iii); 29 C.F.R. § 1979.109(a). The Board has held that a contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Williams v. Domino's Pizza*, ARB 09- 092, ALJ No. 2008-STA-52, slip op. at 5 (Jan. 31, 2011). The Board has observed, "that the level of causation that a complainant needs to show is extremely low" and that an ALJ "should not engage in any comparison of the relative importance of the protected activity and the employer's nonretaliatory reasons." *Palmer v. Canadian National Railway,* ARB No. 16-035, ALJ Case No. 2014-FRS-154, slip op. at 15 (Sept. 30, 2016). Therefore, the complainant "need not show that protected activity was the only or most significant reason for the unfavorable personnel action, but rather may prevail by showing that the respondent's reason, while true, is only one of the reasons for its conduct, and another [contributing] factor is the complainant's protected activity." *Hutton v. Union Pacific R.R.*, ARB No. 11-091, ALJ No. 2010-FRS-00020, slip op. at 8 (May 31, 2013). Put another way, a trier of fact must find the contributing factor element fulfilled when the following question is answered in the affirmative: "did the protected activity play a role, any role whatsoever, in the adverse action?" *Palmer,* ARB No. 16-035, slip op. at 52.

A complainant may prove this element through direct evidence or circumstantial evidence. *DeFrancesco v. Union R.R. Co.*, ARB No. 10-114, slip op. at 6-7 (Feb. 29, 2012). Though "[t]emporal proximity between protected activity and adverse personnel action 'normally' will satisfy the burden of making a *prima facie* showing of knowledge and causation," and "may support an inference of retaliation, the inference is not necessarily dispositive." *Barker v. Ameristar Airways, Inc.*, ARB No. 05-058, slip op. at 7 (Dec. 31, 2007); *see also Powers*, ARB No. 13-034, slip op. at 23 (explaining that at times, temporal proximity alone may be sufficient to demonstrate the element of contributing factor). "Also, where an employer has established one or more legitimate reasons for the adverse action, the temporal inference alone may be insufficient to meet the employee's burden of proof to demonstrate that his protected activity was a contributing factor in the adverse action." *Barber v. Planet Airways, Inc.*, ARB No. 04-056, slip op. at 6-7 (Apr. 28, 2006). "The ALJ is thus *permitted* to infer a causal connection from decisionmaker knowledge of the protected activity and reasonable temporal proximity." *Palmer,* ARB No. 16-035, slip op. at 56.

To succeed in a whistleblower action, a complainant must also show that the employer had knowledge of the protected activity. *Peck v. Safe Air International, Inc.*, ARB No. 02-028, ALJ No. 2001-AIR-3 (ARB Jan. 30, 2004). This requirement stems from the statutory language prohibiting employers from taking adverse action against an employee "because" the employee has engaged in protected activity. *Id.* (citing 49 U.S.C. § 42121(a)). Accordingly, a complainant bears the burden of showing that the person making the adverse employment decision knew about the employee's past or imminent protected activity. *Id.*

Discussion of Contributing Factor Analysis

Assuming, *arguendo*, that Complainant engaged in protected activity by communicating with Respondent and the FAA about the auxiliary fuel tank deactivation and improper maintenance, the Tribunal would find that it was not a contributing factor to his termination. Complainant argues that each of the bases for Respondent's investigation and subsequent termination were pretextual. The Tribunal disagrees.

First, the record shows that Complainant's actions at the RTOD in January 2016 and his communications with ROTD personnel thereafter were the sole catalysts into a conflict of interest investigation by Respondent. Prior to the January 22, 2016 meeting, Mr. Phelps raised concerns about a conflict of interest "with [Complainant] being an active Delta employee and also representing an outside vendor." CX 65 at 1. During the January 22, 2016 meeting, RTOD personnel and Complainant discussed possible solutions to the auxiliary fuel cell maintenance. After that meeting, Mr. Herrington learned that Complainant had made his onto campus and to the FACH-921 unescorted. Tr. at 731. After investigating the circumstances of Complainant's entry, Mr. Herrington shared his concerns with Flight Operations, which led to a larger investigation of Complainant's actions. Tr. at 731-33. The Tribunal found Mr. Herrington's testimony to be credible, including his assertion that his concerns had nothing to do with Complainant reporting any safety related violation. The Tribunal therefore finds no reason to view the temporal proximity of Complainant's presentation and Mr. Herrington's report as circumstantial evidence of a retaliatory motive in referring Complainant's behavior at RTOD for investigation.

Likewise, the undersigned finds no evidence that Captain Davis' investigation of Complainant's activity to be motivated by his alleged protected activity. Captain Davis' investigation initially centered around Complainant's potential improper use of his travel privileges. However, in the course of Captain Davis' investigation and because of his due diligence, Respondent discovered abuses greater than originally known. Specifically, Respondent discovered not only a RTOD security issue,[98] but violations of Respondent's pass travel policy, the improper sharing of login and password information, misuse of sick leave, and Complainant on several occasions being out of position in his reserve status for purposes of furthering his separate business interests. Complainant provided no evidence that Captain Davis or Captain Graham had knowledge of the alleged protected activity until the summer of 2016,

[98] The Tribunal heard testimony about the tight security at Respondent's RTOD, yet its employees discovered Complainant unescorted at the facility. Tr. at 238-39, 751-56.

well after an investigation into his use of travel privileges and flight duty scheduling had ensued. The sole focus of Captain Davis' investigation was on Complainant's conduct as an employee, not any alleged protected activity he engaged in as a potential vendor.[99]

And finally, the Tribunal finds that Respondent's termination of Complainant's employment was not motivated in any part by Complainant's alleged protected activities. As discussed more fully below, the evidence shows that Captain Graham terminated Complainant's employment with Respondent based on numerous findings of intentional misconduct. Tr. at 980-81, 991-92. Accordingly, Complainant has failed to show that any part of Respondent's investigation and eventual termination of his employment was related to his alleged protected activity.

4. Conclusion: Complainant's *Prima Facie* Case

Complainant and Respondent are subject to the Act. Neither Complainant's communications to Respondent nor the FAA constituted protected activity because it was not objectively reasonable that a violation of an air safety regulation occurred or was about to occur. Further, Respondent terminating Complainant as a pilot was an adverse action. Complainant has failed to establish his reports of alleged improper maintenance of FACH-921's auxiliary fuel system represented a contributing factor to his termination of employment. Thus, Complainant's complaint fails and this Tribunal must dismiss it. Nevertheless, the Tribunal opts to addresses the final element in this matter.

5. Whether Respondent Would Have Taken the Same Unfavorable Action Absent Complainant's Protected Activity

After Complainant establishes a *prima facie* case, the Act provides, "Relief may not be ordered . . . if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(iv). "Clear and convincing evidence or proof denotes a conclusive demonstration; such evidence indicates that the thing to be proved is highly probable or reasonably certain." *Clemmons v. Ameristar Airways, Inc.*, ARB No. 08-067, slip op. at 11 (May 26, 2010). The Board further explained, "Thus, in an AIR 21 case, clear and convincing evidence that an employer would have fired the employee in the absence of the protected activity overcomes the fact that an employee's protected activity played a role in the employer's adverse action and relieves the employer of liability." *Id.*

Independent of any allegations of protected activity and causation, the Tribunal finds that Respondent would have terminated Complainant's employment for the misconduct it discovered during the course of its investigation. Respondent reasonably concluded that Complainant had misrepresented himself or his standing to attend the 2016 Lima Conference free of charge in

---

[99] Complainant did "inform" the Chief Pilot that he was supporting RTOD in furtherance of his separate business, but his email in no way suggested to Flight Operations personnel that Complainant was improperly using his travel privileges or shifting his flight schedule to accomplish this. Tr. at 297-99; CX 3.

furtherance of his personal business. Tr. at 81, 825-27; JX 8B-46 to -51. Respondent discovered that Complainant provided Mr. Foo his login and password to access its computers[100] and thereby allowed Mr. Foo to use Complainant's travel pass privileges for Mr. Foo's personal business interests. Complaint admits that he was aware of Respondent's policy prohibiting such actions at the time he provided his credentials to Mr. Foo. Tr. at 247, 678, 850; JX-8B-41. He also admitted to Captain Davis during his investigation that Mr. Foo traveled using Complainant's pass privileges while Mr. Foo was in his capacity as the CEO for MAP. Tr. at 249-52, 584; RX 164-35; JX 8B-85. At Respondent, and in the Part 121 community as a whole, misuse of pass travel is a serious offense and often warrants termination of employment. Tr. at 678, 916.

Complainant also misrepresented his availability to perform reserve flight duty on several occasions. Captain Davis discovered that Complainant had failed to satisfy his reserve duty obligations on May 23-25, 2013, December 8-11, 2014, February 28, 2016, and May 12-14, 2015. Tr. at 802, 833-36; JX 2-264, -265; JX 8B-72 to -74; JX 17-2 to -4; RX 164; *see also* Compl. Br. at 42-44. Complainant essentially does not dispute that he was out of position on these occasions. Tr. at 207-09, 263-66. And Respondent concluded that Complainant violated Respondent's sick leave policy from August 29 to September 3, 2015 and April 19 to 22, 2016 by using the jumpseat and non-revenue pass privileges for extensive travel while on sick leave. Tr. at 815, 837-44; JX 17-4 to -7; JX 8B-124 to -135; RX 164.

Captain Davis briefed Captain Graham about what he discovered and Captain Graham concluded that Complainant engaged in a pattern of intentional misconduct. Captain Graham reasonably determined that he could no longer trust Complainant to "make the right decisions at the right time for the safety of [Respondent's] customers." Tr. at 991; *see also* Tr. at 980-92. In sum, there is clear and convincing evidence that Respondent would have terminated Complainant's employment in the absence of any alleged protected activity.

An employee's protected activity does not insulate him from adverse action stemming from conduct separate and apart from the protected activity. Here, the Tribunal finds Captain Davis' investigation to be appropriate in light of the circumstances, Captain Graham's conclusions of fact to be reasonable, and Captain Graham's disciplinary actions to be warranted by the offenses found.[101] It is not for this Tribunal to second-guess Respondent's decision to terminate Complainant's employment when there is clear and convincing evidence that it would have done so in the absence of any alleged protected activity.[102] Accordingly, even if

---

[100] JX 17; RX 164-36.

[101] Respondent presented evidence that it terminated the employment of another pilot in October 2017 for similar conduct of misuse of pass privileges. RX 231; RX 232.

Respondent also cites to after acquired evidence for further trips by Complainant to perform work for his businesses. *See* RX 46; RX 47; RX 48. The Board has held that the after-acquired evidence doctrine applies to AIR21 claims. *Clemmons v. Ameristar Airways, Inc.*, ABR No. 08-067, slip op. at 2-3, ALJ No. 2004-AIR-011 (Apr. 27, 2012). However, this doctrine only applies when calculating what back pay a Complainant would receive.

[102] *See Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000) ("This court does not sit as a super-personnel department and will not second-guess an employer's decisions."); *Bienkowski v American Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988).

Complainant's reporting of potential FAA violations to Respondent and the FAA was protected activity and his termination was based in part on that protected activity, the Tribunal finds that Respondent would have terminated Complainant irrespective of his protected activity because of his pattern of intentional misconduct.

## V. CONCLUSION

Complainant's complaint fails on several levels. First, the Tribunal finds that it was not objectively reasonable for Complainant to believe that Respondent's maintenance of the FACH-921 would have constituted a violation of any FAA regulation, order, or standard. Second, the Tribunal finds that Complainant's alleged protected activity was not a contributing factor in Respondent's decision to terminate his employment. His misrepresentation during his attempt to be a vendor for Respondent was a catalyst to the eventual investigation that lead to the discovery of additional misconduct, but the alleged protected activity itself had nothing to do with his termination from Respondent's employ. Finally, even if Complainant had met his burden of establishing a *prima facie* case, Respondent established by clear and convincing evidence that it would have taken the same unfavorable action in the absence of Complainant's alleged protected activity.

## VI. ORDER

Complainant's complaint is hereby **DISMISSED WITH PREJUDICE**.

SO ORDERED

Digitally signed by Scott R. Morris
DN: CN=Scott R. Morris, OU=Administrative Law Judge, O=US DOL Office of Administrative Law Judges, L=CHERRY HILL, S=NJ, C=US
Location: CHERRY HILL NJ

**SCOTT R. MORRIS**
Administrative Law Judge

Cherry Hill, New Jersey

**NOTICE OF APPEAL RIGHTS**: To appeal, you must file a Petition for Review ("Petition") with the Administrative Review Board ("Board") within ten (10) business days of the date of issuance of the administrative law judge's decision. The Board's address is: Administrative Review Board, U.S. Department of Labor, Suite S-5220, 200 Constitution Avenue, NW, Washington DC 20210, for traditional paper filing. Alternatively, the Board offers an Electronic File and Service Request (EFSR) system. The EFSR for electronic filing (eFile) permits the submission of forms and documents to the Board through the Internet instead of using postal mail and fax. The EFSR portal allows parties to file new appeals electronically, receive electronic service of Board issuances, file briefs and motions electronically, and check the status

of existing appeals via a web-based interface accessible 24 hours every day. No paper copies need be filed.

An e-Filer must register as a user, by filing an online registration form. To register, the e-Filer must have a valid e-mail address. The Board must validate the e-Filer before he or she may file any e-Filed document. After the Board has accepted an e-Filing, it is handled just as it would be had it been filed in a more traditional manner. e-Filers will also have access to electronic service (eService), which is simply a way to receive documents, issued by the Board, through the Internet instead of mailing paper notices/documents.

Information regarding registration for access to the EFSR system, as well as a step by step user guide and FAQs can be found at: https://dol-appeals.entellitrak.com. If you have any questions or comments, please contact: Boards-EFSR-Help@dol.gov

Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-filing; but if you file it in person, by hand-delivery or other means, it is filed when the Board receives it. *See* 29 C.F.R. § 1979.110(a). Your Petition must specifically identify the findings, conclusions or orders to which you object. You waive any objections you do not raise specifically. *See* 29 C.F.R. § 1979.110(a).

At the time you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8002. You must also serve the Assistant Secretary, Occupational Safety and Health Administration and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210. *See* 29 C.F.R. § 1979.110(a).

If filing paper copies, you must file an original and four copies of the petition for review with the Board, together with one copy of this decision. In addition, within 30 calendar days of filing the petition for review you must file with the Board an original and four copies of a supporting legal brief of points and authorities, not to exceed thirty double-spaced typed pages, and you may file an appendix (one copy only) consisting of relevant excerpts of the record of the proceedings from which the appeal is taken, upon which you rely in support of your petition for review. If you e-File your petition and opening brief, only one copy need be uploaded.

Any response in opposition to a petition for review must be filed with the Board within 30 calendar days from the date of filing of the petitioning party's supporting legal brief of points and authorities. The response in opposition to the petition for review must include an original and four copies of the responding party's legal brief of points and authorities in opposition to the petition, not to exceed thirty double-spaced typed pages, and may include an appendix (one copy only) consisting of relevant excerpts of the record of the proceedings from which appeal has been taken, upon which the responding party relies. If you e-File your responsive brief, only one copy need be uploaded.

Upon receipt of a legal brief filed in opposition to a petition for review, the petitioning party may file a reply brief (original and four copies), not to exceed ten double-spaced typed pages, within

such time period as may be ordered by the Board. If you e-File your reply brief, only one copy need be uploaded.

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1979.110. Even if a Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days of the date the Petition is filed notifying the parties that it has accepted the case for review. *See* 29 C.F.R. §§ 1979.109(c) and 1979.110(a) and (b).

## SERVICE SHEET

Case Name: **SEURING_KARL_v_DELTA_AIR_LINES_INC_**

Case Number: **2018AIR00033**

Document Title: **DECISION AND ORDER DENYING RELIEF**

I hereby certify that a copy of the above-referenced document was sent to the following this 23rd day of August, 2019:

Digitally signed by Donna M. Broome
DN: CN=Donna M. Broome, OU=Paralegal Specialist, O=US DOL Office of Administrative Law Judges, L=CHERRY HILL, S=NJ, C=US
Location: CHERRY HILL NJ

**Donna M. Broome**
Paralegal Specialist

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Associate Solicitor
Division of Fair Labor Standards
U. S. Department of Labor
Room N-2716, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Federal Aviation Administration
Attn: Mr. Al Westrom, Room 911
Whistleblower Protection Program Manager
800 Independence Ave., S.W.
WASHINGTON DC 20591
*{Hard Copy - Regular Mail}*

Associate Regional Solicitor
U. S. Department of Labor
300 Fifth Ave., #1120
SEATTLE WA 98104
*{Hard Copy - Regular Mail}*

Acting Regional Administrator
Region 10
U. S. Department of Labor, OSHA
Suite 1280
300 Fifth Avenue
SEATTLE WA 98104-2397
*{Hard Copy - Regular Mail}*

John Rearden, Jr., Esq.
124 North Water Street
Suite 300 Waterside Center
ROCKFORD IL 61107
*{Hard Copy - Regular Mail}*

Ellen C. Ham, Esq.
Jessica Asbridge, Esq.
271 17th Street N.W., Suite 1900
Suite 2850
ATLANTA GA 30363
*{Hard Copy - Regular Mail}*

**SERVICE SHEET** continued (2018AIR00033 Case Decision) Page: 2

Peter Debruyne, Esq.
838 North Main Street
ROCKFORD IL 61103
*{Hard Copy - Regular Mail}*

*Karl Seuring*

Sept. 5, 2019

Administrative Review Board
US Department of Labor, Suite S-5220
200 Constitution Avenue, NW
Washington, DC 20210

USPO Priority Mail
RE: Petition to Review 2018-AIR-00033

Dear Office of Administrative Law Judges,

In accordance with 29 CFR 1979.110(a) please accept this letter *pro se* as petition to review the legal case decision of 2018-AIR-00033, dated Aug. 23, 2019 as written by ALJ Scott R. Morris.

Regarding case 2018-AIR-00033 and complainant's legal counsel, I am no longer represented by Mr. John Rearden, Jr. of Oliver-Close, LLC. or Mr. Peter DeBruyne, Esq. under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21").

I received Judge Morris' Aug. 23 decision on Aug. 27, 2019. I request the OALJ grant 30-days for complainant to adjoin *special counsel* for this appeal.

My new legal team will then amend this *pro se* petition with "specific findings, conclusions and orders" to which exception is taken from the 2018-AIR-00033 decision.

For the interim, please direct all communications to:

Karl Seuring
5400 Carillon Point
Kirkland, Washington 98033

Sincerely,

K. Seuring

Karl Seuring
keseuring@gmail.com
206/669-8000 (m)

Seuring v. Delta Air Lines, Inc. 2018-AIR-00033

**CERTIFICATE OF SERVICE**

I hereby certify the above referenced document was sent to the following under *hard copy* – Regular mail this 5th of Sept. 2019 by this Addendum. Thank you, *Karl Seuring.*

Mr. Stephen R. Henley, Chief Admin Law Judge
US Department of Labor
Office of Administrative Law Judges
800 K Street NW, Suite 400-North
Washington, DC 20001-8002

Mr. Peter J. Constantine, Associate Solicitor
Division of Fair Labor Standards
US Department of Labor
Room N-2716, FPB
200 Constitution Ave, NW
Washington, DC 20210

Mr. Al J. Westrom
Whistle Blower Protection Program Manager
Federal Aviation Administration, Room 911
800 Independence Ave, SW
Washington, DC 20591

Acting Regional Administrator
Region 10
US Department of Labor, OSHA
Suite 1280
300 Fifth Ave
Seattle, WA 98104-2397

Ellen C. Ham, Esq.
Jessica Asbridge, Esq.
Suite 1900 & Suite 2850
271-17th Street NW
Atlanta, GA 30363

Assist Secretary
Occupational Safety & Health Administration
Room S-2315
200 Constitution Ave, NW
Washington, DC 20210

Director
Whistle Blower Protection Programs
US Department of Labor, OSHA
Room N-4618, FPB
200 Constitution Ave, NW
Washington, DC 20210

Associate Regional Solicitor
US Department of Labor
Suite #1120
300 Fifth Ave
Seattle, WA 98104-2397

John Rearden, Jr. Esq.
124 N. Water Street
Suite 300
Waterside Center
Rockford, IL 61107

Peter Debruyne, Esq.
838 N. Main Street
Rockford, IL 61103

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210

**In the Matter of:**

**CARL SEURING,**

**COMPLAINANT,**

**v.**

**DELTA AIRLINES, INC,**

**RESPONDENT.**

**ARB CASE NO. 2019-0082**

**ALJ CASE NO. 2018-AIR-00033**

**DATE:** SEP 2 6 2019

## ORDER ALLOWING COMPLAINANT TO FILE AN AMENDED PETITION FOR REVIEW

On September 9, 2019, Complainant filed a document styled "Petition for Review." In Complainant's petition, he requests an extension of thirty (30) days to file an amended petition for review. Respondent filed a response to Complainant's Petition for Review. Complainant is advised that he must comply with 29 C.F.R. § 1979.110(a), which states "**the petition for review must specifically identify the findings, conclusions or orders to which exception is taken. Any exception not specifically urged ordinarily shall be deemed to have been waived by the parties.**" If Complainant does not comply with this Order on or before **October 9, 2019**, his petition for review will be **DISMISSED**.

**FOR THE ADMINISTRATIVE REVIEW BOARD:**

WT Barto

**William T. Barto**
**Chief Administrative Appeals Judge**

Note: Questions regarding any case pending before the Board should be directed to the Board's staff: Telephone: (202) 693-6200; Facsimile: (202) 693-6220.

**ADMINISTRATIVE REVIEW BOARD**
**Certificate of Service**

**ARB CASE NAME:** **Carl Seuring**

**ARB CASE NO. :** **2019-0082**

**ALJ CASE NO. :** **2018-AIR-00033**

**DOCUMENT :** **ORDER**

**A copy of the above referenced document was sent to the following persons on**

SEP 2 6 2019
______________.

Juanetta Walker
______________________

**CERTIFIED MAIL:**

Karl Seuring
5400 Carillon Point
Kirkland, Washington 98033

John Rearden, Jr., Esq.
124 North Water Street
Suite 300
Waterside Center
Rockford, IL 61107

Ellen C. Ham, Esq.
Jessica Asbridge, Esq.
271 17th Street, N.W.,
Suite 1900 & 2850
Atlanta, GA 30363

Peter Debruyne, Esq.
838 North Main Street
Rockford, IL 61103

**REGULAR MAIL**

Directorate of Enforcement Programs
U.S. Department of Labor, OSHA
Room N-4618, FPB
200 Constitution Ave., N.W.
Washington, DC 20210

Associate Solicitor
Division of Fair Labor Standards
U.S. Department of Labor
Room N-2716, FPB
200 Constitution Avenue, N.W.
Washington, DC 20210

Federal Aviation Administration
Attn: Mr. Al Westrom, Room 911
Whistleblower Protection Program Manager
800 Independence Avenue, S.W.
Room 911
Washington, DC 20591

Associate Regional Solicitor
U.S. Department of Labor
300 Fifth Ave., 1120
Seattle, WA 98104

Acting Regional Administrator
Region 10
U.S. Department of Labor, OSHA
Suite 1280
300 Fifth Avenue
Seattle, WA 98104-2397

Hon. Stephen R. Henley
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, DC 20001-8002

Hon. Scott R. Morris
Administrative Law Judge
Office of Administrative Law Judge
2 Executive Campus, Suite 450
Cherry Hill, NJ 08002

UNITED STATES DEPARTMENT OF LABOR
ADMINISTRATIVE REVIEW BOARD

| | | |
|---|---|---|
| In the Matter of: | § | |
| Karl Seuring, | § | ALJ Case No. 2018-AIR-00033 |
| *Complainant,* | § | |
| -against- | § | |
| Delta Airlines, Inc., | § | |
| *Respondent.* | § | |

**AMENDED PETITION FOR REVIEW**

Complainant, Karl Seuring, in accordance with 29 C.F.R. § 1980.110(a), hereby submits this Amended Petition for Review of the attached order, dated August 23, 2019 issued by Administrative Law Judge Scott R. Morris of the United States Department of Labor as follows:

**BACKGROUND**

1. On March 13, 2017, Captain James Graham ("Graham") issued the Notice of Intent to terminate Complainant.
2. On March 28, 2017, Complainant filed a grievance challenging the notice of intent to terminate.
3. On April 4, 2017, an initial hearing was held on Complainant's March 28, 2017 grievance. Present at the hearing were Complainant, ALPA representative Phinney, and Company representatives Miller and Zawislak.
4. On April 13, 2017, Graham issued the letter terminating Complainant.
5. On June 5, 2017, Complainant filed his AIR21 complaint with attachments with OSHA. Complainant also filed a copy of his complaint with attachments with the FAA.

6. On June 5, 2017, Complainant was interviewed by OSHA investigators Tobias Cameron and Jen Weist regarding his June 5, 2017 AIR21 Complaint.
7. On March 30, 2018, OSHA dismissed Complainant's June 5, 2017 AIR21 Complaint, deferring to the arbitration proceedings in the case.
8. On May 1, 2018, Complainant filed objections to the March 30, 2018 dismissal.
9. On August 23, 2019 the Office of Administrative Law Judges issued a Decision and Order Denying Relief.
10. On September 5, 2019 Seuring filed a Pro Se Petition to Review the Administrative Law Judge’s Order Denying Relief dated August 23, 2019.

**Findings Expressed Within The Attached Order, dated August 23, 2019 issued by the Administrative Law Judge to Which Complainant Objects:**

**I.** Administrative Law Judge’s finding that “Complainant did not engage in protected activity.”

A. Seuring’s Claims Fit Within the Fundamental Air Safety Purpose of AIR21.

i. AIR21 is primarily a safety statute, not a labor regulation statute. Bombardier, Inc. v. U.S., 145 F. Supp. 3d 21, 33 n. 5 (D.D.C. 2015). “The instant complaint concerns an employee of a U.S.-based air carrier that is subject to FAA regulations who reported to the FAA and company officials that his manager violated Federal aviation safety laws by fraudulently clearing aircraft as safe for air travel. Other than the location of the employee’s position, each key element of Complainant’s complaint has significant interaction with the United States aviation system, and, heedful of Section 42121’s role as a means for safeguarding the U.S. aviation system, it is clear that circumstances of the complaint place it within the scope of claims that Congress intended to enforce.” Jose Dos Santos v. Delta Airlines, Inc., 2013 DOL Ad. Rev. Bd. LEXIS 118, p. 18. As

in Dos Santos, Seuring's claims rely on United States air safety law, not on the law of other nations such as Chile, and the relevant conduct of Delta occurred in the United States, not Chile. Sobhani v. Bombardier Aerospace, No. 2014-AIR-00017 (Decision and Order Denying Respondent's Motion for Summary Judgement, November 4, 2014), pp. 13-15 [Appendix I].

B. Seuring Engaged in Protected Activity.

i. In it's order, the Administrative Law Judge found that Seuring did not engage in proected activity because he did not have an objectively reasonable belief of a violation and that Seuring's communications with the FAA were not protected activity.

ii. According to *Don Douglas v. Skywest Airlines*, 2007 DOL Ad. Rev. Bd. LEXIS 127 [Appendix II], "Such protected activity requires (1) a genuine belief that there was or would be a violation or alleged violation of an FAA order, regulation or standard, or a federal law relating to air carrier safety; (2) this concern was objectively reasonable in the circumstances; and (3) that the complainant expressed the concern in a manner that was 'specific' with respect to the 'practice, condition, directive or event' that gave rise to the concern. Rougas v. Southeast Airlines, Inc., ARB No. 04-139, ALJ No. [*73] 2004-AIR-3, slip op. at 14 (ARB July 31, 2006); Rooks v. Planet Airways, Inc., ARB No. 04-092, ALJ No. 03-AIR-35, slip op. at 18 (June 29, 2006); Peck v. Safe Air International, Inc., ARB No. 02-028, ALJ No. 2001-AIR-3 (Jan. 30, 2004). The complainant's allegation must only be objectively reasonable in the belief that his or her safety complaint is valid, and need not be ultimately substantiated. Rooks, supra, slip op. At 18."

C. Seuring Advised Delta and CAF About Violations Relating to Safety Concerns.

i. On January 20, 2016, Seuring advised Delta TechOps and CAF in an email that a functioning 10-PSI valve was an airworthiness limitation ("unsafe condition") required for the auxiliary fuel system in the FAA-approved portion of the manual referred to in the STC. (CX34; CX340; JX11-000040; Tr. 97:9 – 19). He also pointed out the safety considerations involved in potential damage to the tank walls, for which he was suggesting testing, and for the 10-PSI valve. (CX43, CX45; JX11-000040; Tr. 97:20 – 100:22).

ii. On January 22, 2016, when he met with CAF and Delta TechOps personnel in Atlanta, Seuring told them why FAA approval of maintenance on FACH921 was required and showed them sections of a potential revised manual or service bulletins that discussed those safety concerns. (Tr. 117:6 – 145:13; CX354).

iii. Seuring also communicated with FAA about his safety concerns. (Tr. 174:4 – 175:7). As required, he reported the failure of the 10-PSI relief valve verbally to FAA's David Lee on January 18, 2016. (14 C.F.R. § 121.703(h); Tr. 174:4 – 175:7). Seuring also met with Rebel Nichols, David Lee and another FAA person on January 25 or 26. (Tr. 175:8 – 177:18). Seuring proposed a deactivation service bulletin and a temporary revision to the flight manual that would allow CAF to fly the airplane out of Atlanta deactivated. (Tr. 176:6 – 177:12). Nichols commented that it was likely a deactivation could be done quickly. (Tr. 176:23 – 177:5). The service bulletin and FAA approval were required because deactivation was a major change to the STC under Part 21 of FAR. (Tr. 176:6 – 15).

iv. Seuring's meeting with FAA personnel influenced CX133, which Seuring sent on February 1. (CX133; Tr. 177:19 – 178:9). After FAA's David Lee reviewed the

temporary revision of the flight manual supplement, he called Seuring and said that FAA would have to approve the temporary revision, and that a Designated Engineering Representative could not approve the deactivation of the auxiliary fuel system. (Tr. 178:10 – 21).

v. On February 1, 2016, Seuring asked Delta TechOps and CAF to wait three days to obtain FAA approval of a service bulletin authorizing deactivation of the auxiliary fuel system. (CX136; Tr. 178:22 – 179:11). The next day, Seuring confirmed his discussions with FAA that deactivation would be a major design change, and required FAA approval. (CX141; Tr. 179:12 – 180:3).

vi. Shortly, thereafter, Delta Tech Ops ceased communicating with Seuring. (Tr. 180:4 – 13).

vii. The maintenance manual itself also showed that the deactivation as performed violated legally required Critical Design Configuration Control Limitations in the maintenance manual concerning the condition of the auxiliary fuel system. Chapter 5, section 5-10-01 of the manual for FACH921's auxiliary fuel (JX11-000021 – 45) contained maintenance requirements approved by FAA and made mandatory in the STC. (CX340-0002, ¶ 2.d.; Tr. 69:3 – 19). Section 5-10-01 stated that the 10-PSI pressure relief valve "must remain intact over the life cycle of the AFS

viii. [auxiliary fuel system] installation." (JX11-000040). Section 5-10-01 also stated specific requirements for maintenance of the electrical dry bay. (JX11-000039). These were the requirements that Seuring specifically reviewed with CAF and Delta TechOps representatives on January 22, 2016, the day Delta began investigating him.

ix. In addition, the very sections of the maintenance manual that Delta relied upon referred back to these legally required sections of the manual. (JX11-000115 – 16). On JX11-000115, the manual says, "Gain access to the Transfer and Vent valve actuators in the dry bay of master cell by removing dry bay door per AMMS 28-10-03." (JX11-000115, ¶ 4.A.(3)). In that section 28-10-03, on JX11-000187, the manual refers back to Section 5-10-01 containing the critical airworthiness limitations discussed above. (Tr. 199:14 – 204:23). This section of the manual also says, "Any alterations to the critical ignition source prevention features of the CDCCL identified parts or components listed, or deviations from the approved methods shall, without exception, be considered major alterations and require approval by the originating FAA ACO." (Tr. 199:14 – 204:23; JX11-000034).

x. A Part 145 repair station "may not approve for return to service (1) Any article unless the maintenance, preventive maintenance, or alteration was performed in accordance with the applicable approved technical data or data acceptable to the FAA. (2) Any article after a major repair or major alteration unless the major repair or major alteration was performed in accordance with applicable approved technical data ..." 14 C.F.R. § 145.201(c). Delta did not have the approved technical data or data acceptable to FAA to do the work it did on the auxiliary fuel system of FACH921. (Tr. 94:7 – 95:11).

D. <u>The Safety Concerns Could Have Led To An Explosion</u>.

i. Seuring had studied the detonation of TWA800 in which an accumulation of aviation fuel and fumes had led to an explosion of an aircraft in flight. (Tr. 56:10 – 16; 58:5 – 10).

ii. Seuring testified about the problems he observed with Delta's maintenance actions. Based on his experience, he knew that fuel could collect in an electrical dry bay of a PATS auxiliary fuel system. (Tr. 73:16 – 74:12; 165:18 – 166:9). In Basel, Switzerland, and in southern California, he saw fuel collected in the electrical dry bay of the auxiliary fuel tank. (Tr. 73:16 – 74:12). Fuel collected in the electrical dry bay could lead to an explosion, and PATS had included special considerations to prevent such an explosion. (Tr. 73:16 – 74:12). When he saw the dry bay of the FACH921 auxiliary fuel system, it was closed, indicating that the dry bay had not been inspected or evacuated of fuel and fumes. (Tr. 113:5 – 14).

iii. At Kelowna, Seuring had also seen that failure of a 10-PSI valve could be associated with overpressure and problems with the cells walls of the tanks of the auxiliary fuel system. (Tr. 69:24 – 73:15). Seuring also later received numerous emails from CAF and calls from parts brokers attempting to purchase another 10-PSI valve. (Tr. 185:10 – 23). He later learned that FACH921 was leaking fuel at Victorville, California, after it had experienced a failed 10-PSI valve. (Tr. 188:20 – 189:24).

iv. Seuring reiterated on numerous occasions to Delta and CAF that nondestructive testing should be used, that the 10-PSI valve should be restored to full operation as required, and that the STC required that the auxiliary fuel system be operational before FACH921 could fly. (Tr. 90:3 –20; CX24; Tr. 92:25 – 97:19; CX 34; Tr. 98:10 – 100:22; CX45; Tr. 119:15 – 120:12; CX354; CX9-0001 – 02; Tr. 171:17 – 172:7; CX74; JX11-000024 – 51; Tr. 177:19 – 178:21; CX133; CX136; Tr. 178:22 – 180:3; CX141). Not only did Delta and CAF not take steps consistent with Seuring's advice,

they continued to reiterate that they did not want to take the steps he advised. (Tr. 96:9 – 97:8; CX30; CX43; Tr. 97:20 – 99:10; Tr. 170:21 – 171:23; CX69).

v. Delta and CAF's actions after they stopped communicating with Seuring further support the reasonableness of Seuring's concerns. Delta personnel first asked CAF if they could skip steps required in the auxiliary fuel system maintenance manual (JX11) for deactivation of the auxiliary fuel system. (JX11-000115 – 116; CX169; Tr. 429:4 – 430:8). CAF agreed. (CX169; Tr. 429:4 – 430:8). In fact, it was not until the second day of trial, through witnesses who had to be ubpoenaed over Delta's objections, that Delta finally revealed what they had actually done with the auxiliary fuel system. (JX11-000211 – 212; Tr. 430:1 – 431:18).

vi. Seuring's safety concerns were therefore genuine, eminently reasonable and specific.

E. Seuring's Claims are not Extraterritorial

i. AIR21 applies to Seuring's claims regarding Delta Air Lines, Inc., regardless of the fact that FACH921 was operated by the Chilean Air Force. Delta relies on Shi v. Moog Inc., No. 2016-AIR-00020 (Appendix to Respondent's Post-Hearing Brief (Resp. Appendix), Att. 20), which relied on Villaneuva v. Core Laboratories NV, ARB Case No. 09-108, which said: "In assessing whether a complainant's claims would require extraterritorial application of Section 806, the location of the protected activity would be a factor (which is indeed the driving factor in this case), the location of the job and the company the complainant is fired from, the location of the retaliatory act, and the nationality of the laws allegedly violated that the complainant has been fired for reporting – all of these are indeed a focus of the Section 806 component of SOX."

ii. In that footnote, the Villanueva court also noted, "Indeed, a case where the complainant, for example, is working for a covered company in the United States, but may have worked in a foreign office of the company for part of the time, may require a different outcome; however, we do not address such a situation at this time."

iii. Although the Shi and Villaneuva cases dismissed the complainants' claims for lack of jurisdiction, the factors above point to a different result here. Here, the location of the protected activity, the location of the job and company from which Complainant was fired, the location of the retaliatory act and the nationality of the laws violated are all in the United States.

iv. Seuring, an American citizen who lived in and performed all relevant acts in the United States, alleges that his United States employer, Delta Air Lines, Inc., violated the Act when it terminated his employment over statements that Seuring made to Delta and others in the United States about Delta's and others' violations of United States FAA regulations and statutes regarding maintenance performed in the United States on a Boeing 737 plane operated by the Chilean Air Force.

v. Contrast this to the Court's summary in Shi: "Complainant—a Chinese citizen who at all times relevant to the case lived and worked in China—alleges that his Chinese employer violated the Act when its non- American agents terminated his employment in alleged retaliation over his expressed concerns regarding the creation of Chinese-made aircraft parts, which were purportedly placed into service by certain American aircraft manufacturers."

**II.** Seuring's Protected Activity Was Not a Factor In Delta's Decision to Terminate His Employment

A. Seuring Suffered Unfavorable Personnel Action as a Result of His Protected Activity.

i. According to *Don Douglas v. Skywest Airlines*, 2007 DOL Ad. Rev. Bd. LEXIS 127 [Appendix II]. "A contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the decision concerning the adverse personnel action, Bechtel v. Competitive Technologies, Inc., ARB No. 09-952, ALJ No. 2005-SOX-33, slip op. at 12 (ARB Sept. 30, 2011) (citing Marano v. U. S. Dep't of Justice, 2 F.3d 1137, 1140 (Fed. Cir. 1993)), aff'd sub. nom. Bechtel v. U.S. Dep't of Labor, Admin. Rev. Bd., 2d Cir., No. 11-4918 (2d Cir. 2013). In the absence of direct evidence of causation, contributing factor may be proven through circumstantial evidence, which may include temporal proximity, indications of pretext, inconsistent application of employer's policies, and shifting explanations for an employer's actions. Bechtel, ARB No. 09-952, at 13. If a complainant shows evidence of pretext, he may rely on inferences drawn from such pretext to establish by a preponderance of the evidence that protected activity was a contributing factor in the unfavorable personnel action. Bechtel, ARB No. 09-952, at 13. Although the ARB has stated that "proof of causation or 'contributing factor' is not a demanding standard," Rudolph v. National Railroad Passenger Corp., ARB No. 11-037, ALJ No. 2009 FRS 015, slip op. at 15, (Mar. 29, 2013), as previously discussed, the applicable evidentiary burden nevertheless remains preponderance of the evidence."

ii. Additionally, in Berroa Anthony v. Spectrum Health Hospitals, d/b/a/ Aerome, No. 2013 AIR 21 [Appendix III]. "The determination of contributing factor essentially has two components: knowledge and causation.26 In other words, the employer must have been aware of the protected activity (knowledge) and the protected activity was a

contributing factor in the decision to take the adverse personnel action (causation). Further, knowledge of a protected activity may be either actual or imputed. Regarding the latter category, relying on the 'cat's paw" legal concept of liability recognized in Staub v. Proctor Hosp., 131 S. Ct. 1186 (2011), the ARB has concluded a complainant need not prove the decision maker responsible for the adverse action actually knew of the protected activity if he can establish that any person advising the decision maker on the adverse action was aware of the protected activity. Rudolph, slip op 17. Notably, under these adjudication principles, [N]either motive nor animus is required to prove causation ... as long as protected activity contributed in any way to the adverse action.' Petersen v. Union Pacific Railroad Co., ARB No. 13-090, ALJ No. 2011-FRS-17 (ARB Nov. 20, 2014). In other words, while an employer's stated basis for its action is a consideration,27 the complainant's burden under the contributing factor standard does not require proof of discriminatory intent. See Bechtel, slip op. at 13 (the four elements that a claimant must prove by a preponderance of the evidence are: a) statutorily protected activity, b) employer's knowledge of the protected activity, c) adverse action, and d) contributing factor). See Powers v. Union Pacific RR Co., ARB No. 13-0334, ALJ No. 2010 FRS 30, dissenting opinion, slip op. 46 (ARB March 20, 2015) (there is no inherent limitation on specific admissible evidence that can be evaluated for determining contributing factor)."

B. <u>Delta Knew of Seuring's Protected Activity</u>

i. Under the "cat's paw" theory, Complainant need not prove that the actual decision-maker knew of the protected activity if a person advising the decision-maker knew of

the protected activity. Staub v. Proctor Hosp., 562 U.S. 411, 131 S. Ct. 1186, 1192-93 (2011); Berroa Anthony [Appendix III].

ii. Delta TechOps passed on to Delta's Flight Ops investigators the safety concerns Seuring had raised with TechOps, CAF and FAA. After Todd Herrington learned that Seuring was being investigated, he passed on comments from the TechOps personnel who had met with Seuring and from CAF representatives to Davis. (CX194-0001; CX195; CX196; CX184-0001 – 02; Tr. 736:4 – 739:15). Those comments included "choice words" (as Herrington described them) from the CAF representatives complaining that they did not want to buy the nondestructive testing Seuring had recommended and that the 10-PSI valve was working fine (CX184-0001 – 02), even though CAF continued to try to replace the valve through third-party brokers (Tr. 180:14 – 22; 367:24 – 369:3). Herrington's comments, including the "choice words," were sent to Jason Zawislak, who sent them on to Capt. Philip Davis. (CX196-0001).

iii. Seuring advised Capt. Philip Davis, among others, that there were "safety of flight" issues involved with their investigation. (Tr. 828:16 – 829:5; RX151-0001). Davis later commented that it looked like Seuring had been pushing too hard to sell a product. (Tr. 864:10 – 865:6; CX196-0001). The "product" in question was the nondestructive testing Seuring had recommended and any services regarding the 10-PSI valve. (CX184-0001 – 02).

iv. A group of Flight Ops managers also received information about potential discipline to pilots and other flight operations employees. (Tr. 795:8 – 796:4). These managers held DEALS meetings to discuss the persons under discipline, including Seuring, who was apparently a particular object of interest. (Tr. 795:8 – 796:4; 862:21 – 863:25; CX112).

The ultimate decision-maker as to Seuring's termination, Capt. James Graham, participated in the DEALS meetings. (Tr. 863:5 – 14; 988:6 – 9), and Graham or the senior vice-president of Flight Operations, Capt. Stephen Dickson, may have asked Capt. O.C. Miller about Seuring's case. (Tr. 862:21 – 863:25; CX112).

v. Capt. Graham testified that he was advised of Seuring's safety concerns in about August 2016. (Tr. 981:13 – 25).

C. Seuring's Protected Activity Caused Delta to Terminate

i. Before the events of January 22, 2016, Seuring had an unblemished 30-year record with his employer, and was highly regarded. (CX108; Tr. 195:2 – 196:5). On January 26, 2016, Seuring's superior, Capt. Rip Johnson, described Seuring to Capt. Philip Davis as "a real stand up guy." (CX108).

ii. The investigation that led to Seuring's termination followed closely upon Seuring's protected activity. From January 20, 2016, to January 22, 2016, Seuring told TechOps and CAF that an FAA-approved service bulletin should be used if the auxiliary fuel system were deactivated and that the 10-PSI valve should be repaired. (Tr. 92:21 – 100:22; CX24; CX28; CX30; CX32; CX34; CX45). On January 22, 2016, Seuring came to Atlanta and told TechOps and the CAF about the mandatory FAA requirements concerning the 10-PSI valve contained in the maintenance manual and other FAA-approved instructions for continued airworthiness.

iii. ( JX11-000024 – 51; Tr. 69:9 – 19; 117:23 – 145:13; CX354). On January 22, 2016, Todd Herrington began checking into Seuring's registration at TechOps. (Tr. 730:24 – 732:20). On January 26, 2016, Capt. Davis began investigating. (Tr. 788:20 – 789:5).

iv. By communicating his safety concerns, Seuring became a thorn in Delta's side. Delta personnel, who had already decided that they preferred not to obtain FAA approval, became concerned that Seuring would not "stand down" and allow Delta and CAF to proceed with deactivation without obtaining FAA approval. (CX74; Tr. 423:4 – 425:6).

v. Delta and CAF were also concerned that they would not be able to meet the established turnaround time of 35 days to get FACH921 completed as scheduled. (Tr. 427:16 – 428:6; 601:15– 602:10; 620:7 – 20; 640:21 – 641:10; RX185-0019). Seuring's recommendations that FAA approval be obtained further threatened achievement of the turnaround time.

D. Delta's Actions Show Pretext

i. Immediately after meeting with Seuring, Todd Herrington went to look at Seuring's sign-in sheet. (Tr. 730:24 – 732:20). Herrington sent emails raising questions about potential conflict of interest, without knowing about Seuring's communications with his superiors, and potential use of company positive space business travel, which he learned were inaccurate. (CX77; CX78; Tr. 732:21 – 735:22).

ii. Capt. Davis testified that his investigation of Seuring was triggered by Seuring's appearance at Delta TechOps on January 22, 2016, a possible conflict of interest and a concern that he had used company business positive space travel to go to Lima, Peru. (Tr. 788:18 – 789:5). Capt. Graham testified that the events of Seuring's appearance at Delta TechOps on January 22, 2016, triggered the investigation into Seuring's conduct. (Tr. 998:10 – 15). Davis knew of no prior discipline that Seuring had received. (Tr. 860:11 – 17). Delta had no rules or standard procedure to follow about investigating pilots. (Tr. 860:18 – 23).

iii. Within 48 hours Davis concluded that Seuring had not used positive business space travel. (Tr. 860:24 – 861:6). Davis paused his investigation while Delta's Human Resource Department investigated a potential conflict of interest, and the Human Resource Department determined that it would not proceed any further on the conflict of interest issue. (Tr. 793:22 –94:3). Delta does not have progressive discipline for pilots, and gave Seuring no progressive discipline. (Tr. 877:15 – 878:3; 880:1 – 4).

iv. Why did Delta continue to investigate?

v. According to Delta's termination letter, after an investigation from January 2016 to April 2017, which researched Seuring's conduct for the previous three years, it terminated Seuring based on use of non-revenue travel and his handling of non-revenue travel, being out of position for reserve duty and use of sick leave and travel while sick. (RX230-0003 – 06; JX).

vi. Delta did not know about any of the incidents on which it based its termination before Davis's investigation began, other than knowing that Seuring had gone to Lima. (Tr. 194:15 – 196:5). The termination letter itself said, "On January 22, 2016, you were discovered in a restricted area of Delta's Technical Operations department ('Tech Ops') in Atlanta, Georgia without appropriate credentials. When confronted, you identified yourself as a Delta pilot and showed your Delta identification, however it was determined that you were not there on behalf of Delta. Instead, you inappropriately used your Delta credentials to gain access to a restricted area on behalf of Airspeed Engineering, one of three aviation parts supply companies you own. An Airspeed Engineering client was having contract maintenance work performed by Tech Ops and you had not previously disclosed to Tech Ops or the client that you were a Delta pilot,

creating a potential conflict of interest. This incident triggered an investigation into your outside business interests and the investigation expanded when irregularities were found in your non-revenue travel and flight scheduling records. As a result, the Company's investigation into your conduct revealed multiple policy violations and misrepresentations." (RX230-0003-06; JX5).

vii. Davis's investigation went back three years into Seuring's history. (Tr. 862:19 – 20; JX5-0001). After an investigation from January 2016, to April 2017, Delta terminated Seuring's employment on April 13, 2017. (JX5-0003). Delta presented no evidence that Seuring had any previous misconduct or other issues that would have triggered such an investigation. (Tr. 860:15 – 17).

viii. Delta's investigation was triggered by unsupported allegations, and its decision to terminate was based on pretext.

E. Seuring Being "found unescorted" Was a Pretext

i. Although all of the evidence concerning Seuring's entry into the TechOps center was in Delta's control, Delta presented no witness that actually met Seuring unescorted. Delta did not present the never-identified security agent who talked to Seuring upon his entry into TechOps and who sent Seuring on his way toward FACH921.

ii. Seuring's description of how he entered TechOps is therefore uncontradicted, and must be taken as true.

iii. Seuring traveled to Atlanta, and advised Delta TechOps of his arrival by calling a number that had been provided to him and by email. (CX57; Tr. 104:22 – 105:12, 107:9 – 108:7). The person Seuring spoke to at TechOps invited him to visit TechOps. (Tr.

107:9 – 108:7). Ron Phelps testified that he spoke to Seuring, and advised him how to come to TechOps. (Tr. 437:24 – 438:15).

iv. Seuring drove to the TechOps parking lot, showed his Delta crew ID to the parking attendant, and parked in the lot. (Tr. 108:8 – 109:7). At the "cheese-grater" entry point, Seuring called on the call box and was buzzed in. (Tr. 108:8 – 109:7). Seuring could not have got into the facility if he were not buzzed in by a security guard. (Tr. 762:5 – 764:2; Tr. 109:8 – 17).

v. He walked to the security agent at the desk wearing his Delta crew ID, introduced himself as a Delta Seattle pilot and said he was there to meet with TechOps. (Tr. 109:18 – 110:3).

vi. Seuring signed in as "SEA Pilot," and as AirSpeed. (Tr. 110:4 – 110:8; JX8b-0122). Another person signed in with pilot credentials the same day who was not listed as escorted.

vii. (JX8b-0122). After calling a TechOps contact, the security agent told Seuring that he should start walking and that his contact would meet him halfway. (Tr. 110:9 – 15). Close to the hangar bay, Seuring met someone, and they walked about 20 yards, and the contact showed Seuring FACH921, and remained with him. (Tr. 110:16 – 112:2).

viii. Delta TechOps personnel told Seuring to remove his Delta crew ID before meeting with CAF. (Tr. 117:23 – 118:10; 728:12 – 22). Seuring complied. (Tr. 117:23 – 118:10; 728:12 – 22).

ix. The evidence showed no misconduct on Seuring's part, yet Delta conceded that Seuring's appearance at TechOps triggered their entire investigation. (JX5a-0001; RX230-0003-06; Tr. 998:10 – 15).

F. Conflict of Interest Was a Pretext

i. On January 11, 2016, Seuring advised his superiors, Jeffrey O. Morgan and Rip Johnson, that he would be entering into an economic relationship with Delta TechOps. (CX3). Johnson responded, "Nice job!!" (CX3). His superiors did nothing to pass on the information about Seuring's to TechOps, and were not punished.

ii. After three months of investigation, Delta's Human Resource department decided not to pursue the matter any further. (Tr. 793:22 – 794:3)

G. Nonrevenue Travel Abuse Was a Pretext

i. Although Delta claimed that a reason for Seuring's termination was unauthorized use of nonrevenue travel, Delta's claim was based on facts that do not stand up. Seuring testified that his use of nonrevenue passes was appropriate, because, as the policy allowed, he was using the passes for leisure to visit friends. (JX8b-0009; Tr. 77:25 – 78:6; 81:21 – 82:11; 294:14 – 295:15; 298:11 – 299:9; 303:14 – 20).

ii. First, Delta criticized Seuring's use of a nonrevenue pass to travel to an MRO conference in Lima, Peru, at which Seuring said he intended also to meet friends, as allowed in Delta's travel policy. (JX5-0001). Delta's own witness, Nicky Gomez-Pretzer, made the same trip to the same conference, also intending to meet friends and family, apparently without being punished. (Tr. 635:12 – 22; 636:16 – 637:18; 642:5 – 10).

iii. Although Delta claimed that Seuring's trips to locations at which one of his companies was located represented unauthorized use of a nonrevenue pass, Seuring testified that he simply checked into the business on such trips, and Delta presented no evidence

concerning whether or not Seuring met friends at any location. (Tr. 77:25 – 78:6; 81:21 – 82:11; 294:14 – 295:15; 298:11 – 299:9; 303:14 – 20).

iv. Delta's evidence concerning the meaning of its travel pass policy also did not match up to its treatment of Seuring. Capt. Graham, Delta's decision-maker concerning Seuring's termination, testified that a Delta employee could visit with a stockbroker while on a non-revenue pass without violating the travel pass policy. (Tr. 999:13 – 1000:14). Similarly, Graham testified that, if an employee visited a manager of his business on a nonrevenue pass when the

v. employee also visited friends, Delta would have to determine the primary purpose of the visit to determine whether the travel pass was appropriate. (Tr. 1000:16 – 1001:13). Delta presented no evidence to show that, when Seuring checked in with one of his businesses on a trip, the primary purpose of his trip was business travel, rather than leisure travel.

vi. Delta also found out that Seuring had provided Chok-Pin Foo his sign-in information, and relied on that as a reason for termination. Seuring testified that it was common among Delta employees. (Tr. 247:17 – 249:23). Seuring also testified that Foo's travels for MAP International were not business travel, but were on behalf of a charity. (Tr. 249:24 – 252:18).

H. <u>Out of Position Was a Pretext</u>

i. Seuring testified without contradiction that he was in position for flights the overwhelming percentage of time, and that the days in which he was accused of a violation, either of sick leave abuse or of being out of position, were less than two

percent of his scheduled days. (Tr. 207:18 – 209:8). Seuring testified that he was available for days that Delta claimed he was out of position. (Tr. 266:1 – 24).

I. Sick Leave Abuse Was a Pretext

i. Delta's claim that Seuring abused sick leave depends on its conclusion that he abused sick leave every time he flew on another carrier's jump seat while sick, regardless of his actual physical condition. Delta's rule that a pilot may not fly the jump seat on another carrier while sick governs Delta's jump seat, as it is contained in Delta's operations manual, and not in the

ii. Pilot Working Agreement. (JX8b-0068 – 69; Tr. 271:4 – 272:15; 274:1 – 276:1). In addition, Seuring's reason for calling in sick, episodic pain from a hand injury, was not incapacitating for serving as a crew member on the jump seat. (Tr. 275:4 – 276:1).

J. Delta Failed to Show it Would Have Fired Seuring Anyway

i. Delta has not provided clear and convincing evidence that it would have fired Seuring in the absence of his protected behavior. 42 U.S.C. § 42121(b)(2)(B)(iv); 29 C.F.R. §1979.109(a). Delta has no standard to show that Seuring's misconduct merited termination. It has no progressive discipline policy or rules in existence, and it applied no progressive discipline to Seuring (Tr. 877:14 – 878:3; 880:1 – 4). It showed no comparable employee who was treated similarly for similar conduct. Delta has no policy concerning investigations, no standard (Tr. 860:15 – 23) for why an investigation of the magnitude of Delta's would even be launched against a 30-year employee with no disciplinary history whose experience was in great demand, according to Delta's witness. (Tr. 892:5 – 893:14).

ii. Second, the instigation of Delta's investigation is intimately connected to the beginning of Seuring's protected activity on January 22, 2016. No clear and convincing evidence therefore shows that Delta even would have known of the conduct stated in Delta's termination letter, absent Seuring's protected activity. This was a factor considered in Berroa Anthony, and resolved against the complainant when the administrative law judge found specific facts that demonstrated that the employer would have learned of the alleged misconduct without the protected activity. Berroa Anthony v. Spectrum Health Hospitals, Complainant's (Comp.) Appendix II, pp. 154-55. No such evidence has been provided here.

iii. Third, Seuring's claimed misconduct is not the sort of obvious misconduct that anyone would recognize as meriting termination, such as physical violence, intoxication on duty, insubordination or sexual harassment. Instead, Delta relies on its proclamations, unsupported by evidence, such as that violation of an airline's travel policy is one of the worst violations an airline employee can commit. (Delta Brief, p. 2).

iv. Fourth, the standard is not satisfied by showing that Delta might or could have fired Seuring. In Douglas v. Skywest, the Administrative Review Board carefully distinguished between evidence that an employer could have fired an employee, and evidence that it would have done so. (Douglas, p. 34, Comp. Appendix II). In that case, the Board determined that a new reason for termination stated by respondent after the termination actually showed shifting explanations for his termination, which in itself was evidence of pretext. (Douglas, p. 34, Comp. Appendix II).

v. Delta has failed to provide clear and convincing evidence that it would have fired Complainant in the absence of his protected activity.

K. Seuring Had Good Faith and Reasonable Belief

i. Seuring Had a Good Faith Belief

ii. Delta's attempt to change the standard for a good faith belief from "a genuine belief that there was or would be a violation or alleged violation of an FAA order, regulation or standard, or a federal law relating to air carrier safety" (Douglas v. Skywest Airlines, p. 19, Comp. Appendix II) to "a subjective, good faith belief that Delta violated any law relating to air carrier safety"(Delta Brief, p. 25), is unsupported by any authority.

iii. Delta also claims that Seuring had no good faith belief because he was just trying to make a sale. What else he would be doing? Seuring's business sold services and products. In the course of the relationship with Delta and CAF, those businesses sold and shipped only a couple of small parts for which they have never been paid. (Tr. 75:3 – 24). Everyone but Seuring was being paid. All the Delta and Chilean Air Force employees were presumably being paid. Only Seuring and his companies, who spent considerable time and energy communicating with Delta and CAF concerning the possibility of being hired, were not paid, and have never been paid a dime for any of the work they performed or the products they provided. (Tr. 75:3 – 24). Seuring's business position therefore no more shows his lack of good faith than the employment position of every Delta witness shows their motivation to say things to preserve their employment.

iv. Delta further argues that Seuring had no good faith belief because he continued to remain the contact with Delta and CAF, rather than bringing in a Designated Engineering Representative to consult with Delta and CAF. Again, this takes nerve to suggest. Seuring and his companies were never hired. (Tr. 91:2 – 7; 95:7 – 11).

Engineers cost money. (Tr. 66:9 – 15). Delta casts aspersions on Seuring and his case for not spending even more to communicate and provide expertise to Delta and CAF, when they never even paid him for the tiny amount of products they ordered and received.

v. Delta's argument that he had no good faith because Timothy Bishop stated the law to him is even less convincing. (Delta Brief, p. 23). The Court has not determined the issues of law in this case, and Delta did not even attempt a motion for summary disposition. So Seuring's failure to accept the statement of non-lawyer Timothy Bishop, who did not even bother to read any of the manual other than the two pages he was handed (Tr. 958:5 – 14; 959:7 – 960:7), can hardly show Seuring's lack of good faith, especially when Seuring himself, as part of his business often works with and refers to federal aviation laws and regulations, including those relating to aircraft registered in foreign countries which use Supplemental Type Certificates. (Tr. 58:19 – 63:23).

vi. Delta's claim that Seuring had no good faith belief because Seuring's proposed service bulletin has never been approved also shows that Delta still expects Seuring and his companies to work for them and CAF without payment. (Delta Brief, p. 26). Delta suggests no reason why Seuring should try to obtain approval of a service bulletin for a nonpaying customer, or why not obtaining such approval shows his lack of a good faith belief in a legal violation. In fact, Delta's argument means that, to show his good faith belief, Seuring would have had to cure Delta and CAF's legal violation of failing to obtain FAA approval of their deactivation.

vii. The Court must judge for itself whether or not Seuring genuinely believed in the steps that he suggested should be pursued. Complainant contends that Seuring overwhelmingly demonstrated his good faith belief at trial.

L. <u>Seuring Had an Objectively Reasonable Belief</u>

i. Seuring's objectively reasonable belief that there was or would be a violation or alleged violation of an FAA order, regulation or standard was, among other reasons, based on Delta's use of the 10-PSI valve, and the connection between the failed 10-PSI valve and the dents in a tank cell.

ii. Delta's deactivation procedure, which it based on a portion of the auxiliary fuel system manual not approved by FAA, violated portions of the manual approved by FAA. The FAA-approved portion of the manual required the 10-PSI valve to "remain intact over the life cycle of the AFS installation." (JX11-000040). As Seuring testified: "Specifically, the 10 PSI valve is noted here on 05 AWL 04, master cell drive bay component, that's JX-11-39, followed by JX-11-40. You've got to have working parts in the system for it to be a full up and operating system. I don't think any of us would contest here that an FAA PMA approved part installed in an airplane, that's not functional, is an approved part." (Tr. 562:13 – 25)."

iii. Chapter 5 of the Manual states: "The Auxiliary Fuel System (AFS) Airworthiness Limitations section 05-10-01 is FAA-approved and specifies maintenance required under 43.16 and 91.403 of the Federal Aviation Regulations, unless an alternative program has been FAA approved." (JX11-000031).

iv. "Any alterations to the critical ignition source prevention features of CDCCL identified parts or components listed, or deviations from approved methods, shall without

exception be considered major alterations and require approval by the originating FAA ACO." (JX11-000034). See also CX340-0002.

v. Even the portion of the manual Delta used did not support its actions. Ch. 28-00-00 says, "Assure that the component/part is functioning within established performance standards prior to installation." (JX11-000105). To complete the operational check on the 10PSI valve, Ch. 28-00-02 required Delta to "Remove tags and push in Main power circuit breakers and the following auxiliary fuel system circuit breakers." (JX11-000123).

vi. FAR 91.403 says, "A person must not alter an aircraft based on a supplemental type certificate unless the owner or operator of the aircraft is the holder of the supplemental type certificate, or has written permission from the holder." This regulation is not limited to an "air carriers" but applies to any person performing maintenance or making a major design change.

vii. Delta deactivated the auxiliary fuel system, and placed it back in the aircraft before it flew away. (Tr. 655:14 – 18). When tested, the 10-PSI valve had remained open, and did not "freely open and close as internal tank pressure cycles from 9 to 11 PSID relative to ambient pressure." (JX11-000040; Tr. 666:8 – 24). The 10-PSI valve was not fully operational, because it would not hold pressure as specified. (Tr. 666:8 – 24).

viii. Delta first advised Seuring that the valve's failure did not matter, because it was not holding too much pressure, but rather a failure to hold pressure. (CX45-0002). Seuring was rationally concerned about using an admittedly non-functioning part to regulate fuel and fumes in a flying aircraft. (CX45-0001; Tr. 97:25 – 100:22).

ix. Delta's evidence that the valve later worked after failing the initial test (Tr. 633:21 – 634:10) was cast into doubt by Seuring's testimony and evidence that CAF continued to seek a replacement for the valve. (Tr. 180:14 – 22; 185:10-23; 368:10 – 369:19). Third-party parts brokers for CAF repeatedly contacted Seuring in 2016 and 2017 seeking a replacement for the 10-PSI valve. (Tr. 180:14 – 22; 185:10-23; 368:10 – 369:19).

x. Seuring had also seen instances in which a malfunctioning pressure relief valve resulted in damage to the tank cell walls of another B737. (Tr. 70:4 – 23). While Kelly testified that the tank cells' honeycomb structure prevented a fuel build-up, his testimony related to fuel and fumes that reached the interior walls of the cell, not to fumes that could accumulate inside the cell. (Tr. 718:21 – 719:11).

xi. Without a functioning 10-PSI valve and without approval of its modifications to the system, Delta and CAF made a major design change to FACH921's configuration without FAA approval. Delta employees recognized this reality: Phelps agreed that Delta could not take steps into the activation procedure without Seuring's agreement as STC holder. (Tr. 445:3 – 21; CX172).

xii. Seuring does not need to prove that he was absolutely right. He needs to prove that he had an objectively reasonable belief that there was or would be a violation. He did.

**<u>Orders Expressed Within the Attached Order, Dated December 11, 2017, Issued by Judge Price to Which Complainant Objects:</u>**

A. Judge Morris' order to dismiss the complaint filed with OSHA on or before June 1, 2017 on the grounds that Complainant failed to state a claim upon which relief and reinstatment can be granted.

**CONCLUSION**

For the foregoing reasons, Complainant respectfully request that a review by the Administrative Review Board of Administrative Law Judge Scott Morris' order dated August 23, 2019 granting Respondent's motion to dismiss be granted.

Dated: October 10, 2019

Respectfully submitted,

*Karl Seuring*____________
Karl Seuring
5400 Carillon Point
Kirkland, Washington 98033

**CERTIFICATE OF SERVICE**

I hereby certify that on Ocotber 10, 2019 a true and correct copy of the foregoing Amended Petition for Review was served via certified mail return receipt on the following parties:

Administrative Review Board
U.S. Department of Labor, Suite S-5220
200 Constitution Avenue, NW
Washington, D.C. 20210

John Rearden, Jr., Esq.
124 North Water Street Suite 300
Waterside Center
Rockford, IL 61107

Ellen C. Ham, Esq.
Jessica Asbridge, Esq.
271 17th Street, N.W.,
Suite 1900 & 2850
Atlanta, GA 30363

Peter Debruyne, Esq.
838 North Main Street
Rockford, IL 61103

Chief Administrative Law Judges
Office of Administrative Law Judges
U.S. Department of Labor
800 K Street NW
Suite 400 North
Washington, D.C.20001-8002

Directorate of Whistle Blower Protection Programs
U.S. Department of Labor, OSHA
Room N-4618, FPB
200 Constitution Ave., N.W.
Washington, DC 20210

Associate Solicitor
Division of Fair Labor Standards
U.S. Department of Labor
Room N-2716, FPB
200 Constitution Avenue, N.W. Washington, DC 20210

Federal Aviation Administration
Attn: Mr. Al Westrom, Room 911 Whistleblower Protection Program Manager 800
Independence Avenue, S.W.

Room 911
Washington, DC 20591

Associate Regional Solicitor
U.S. Department of Labor
300 Fifth Ave., 1120
Seattle, WA 98104

Acting Regional Administrator
Region 10
U.S. Department of Labor, OSHA
Suite 1280
300 Fifth Avenue
Seattle, WA 98104-2397

Hon. Stephen R. Henley
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, N.W., Suite 400 Washington, DC 20001-8002

Hon. Scott R. Morris
Administrative Law Judge
Office of Administrative Law Judge
2 Executive Campus, Suite 450
Cherry Hill, NJ 08002

UNITED STATES DEPARTMENT OF LABOR
ADMINISTRATIVE REVIEW BOARD

| | | |
|---|---|---|
| In the Matter of: | § | |
| Karl Seuring, | § | |
| *Complainant,* | § | ALJ Case No. 2018-AIR-00033 |
| -against- | § | |
| Delta Airlines, Inc., | § | |
| *Respondent.* | § | |

**COMPLAINTANT KARL SEURING'S MOTION FOR LEAVE TO FILE AN AMENDED PETITION FOR REVIEW**

Complainant, Karl Seuring, respectfully ask this Court for leave to amend their Petition for Review.

Complainant is close to retaining counsel but will not be able to do so until early next week.

Therefore, Complainant has filed an Amended Petition for Review *Pro Se* until his counsel can make a formal appearance.

Dated: October 10, 2019

Respectfully submitted,

*Karl Seuring*____________
Karl Seuring
5400 Carillon Point
Kirkland, Washington 98033

**CERTIFICATE OF SERVICE**

I hereby certify that on Ocotber 10, 2019 a true and correct copy of the foregoing Amended Petition for Review was served via certified mail return receipt on the following parties:

Administrative Review Board
U.S. Department of Labor, Suite S-5220
200 Constitution Avenue, NW
Washington, D.C. 20210

John Rearden, Jr., Esq.
124 North Water Street Suite 300
Waterside Center
Rockford, IL 61107

Ellen C. Ham, Esq.
Jessica Asbridge, Esq.
271 17th Street, N.W.,
Suite 1900 & 2850
Atlanta, GA 30363

Peter Debruyne, Esq.
838 North Main Street
Rockford, IL 61103

Chief Administrative Law Judges
Office of Administrative Law Judges
U.S. Department of Labor
800 K Street NW
Suite 400 North
Washington, D.C.20001-8002

Directorate of Whistle Blower Protection Programs
U.S. Department of Labor, OSHA
Room N-4618, FPB
200 Constitution Ave., N.W.
Washington, DC 20210

Associate Solicitor
Division of Fair Labor Standards
U.S. Department of Labor
Room N-2716, FPB
200 Constitution Avenue, N.W. Washington, DC 20210

Federal Aviation Administration

Attn: Mr. Al Westrom, Room 911 Whistleblower Protection Program Manager 800
Independence Avenue, S.W.
Room 911
Washington, DC 20591

Associate Regional Solicitor
U.S. Department of Labor
300 Fifth Ave., 1120
Seattle, WA 98104

Acting Regional Administrator
Region 10
U.S. Department of Labor, OSHA
Suite 1280
300 Fifth Avenue
Seattle, WA 98104-2397

Hon. Stephen R. Henley
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, N.W., Suite 400 Washington, DC 20001-8002

Hon. Scott R. Morris
Administrative Law Judge
Office of Administrative Law Judge
2 Executive Campus, Suite 450
Cherry Hill, NJ 08002

**BEFORE THE ADMINISTRATIVE REVIEW BOARD**
**UNITED STATES DEPARTMENT OF LABOR**

| | |
|---|---|
| **KARL SEURING,**<br><br>**Complainant,**<br>**v.**<br><br>**DELTA AIR LINES, INC.**<br><br>**Respondent.** | **ARB CASE NO. 2019-0082**<br><br>**ALJ CASE NO. 2011-AIR-12** |

**RESPONDENT DELTA AIR LINES, INC.'S RESPONSE TO COMPLAINANT'S UNTIMELY AMENDED PETITION FOR REVIEW**

Respondent Delta Air Lines, Inc. ("Delta") hereby responds to Complainant Karl Seuring's ("Complainant") amended petition for review. Because he failed to file his amended petition by the October 9, 2019 deadline set forth in the Administrative Review Board's September 26, 2019 order, his amended petition should be dismissed and Administrative Law Judge ("ALJ") Morris' decision dismissing his AIR21 complaint should become the final order of the Secretary of Labor.

## ARGUMENT

Complainant was warned by ALJ Morris that a failure to comply with 29 C.F.R. § 1979.110 by September 9, 2019 (within ten business days of the date of the ALJ's August 23, 2019 decision) would result in the ALJ's decision becoming the final order of the Secretary of Labor. (*See* ALJ Morris' Decision at 47-48.) Complainant did not heed this warning. Rather, on September 5, 2019, Complainant filed a letter entitled "Petition to Review," but failed to comply with 29 C.F.R. § 1979.110(a), as he failed to identify a single finding or conclusion with which he took exception. Instead, he requested a 30-day extension of time to file a petition that complied with the regulations.

On September 26, 2019, the Administrative Review Board ("ARB") ordered Complainant to comply with 29 C.F.R. § 1979.110(a) by **October 9, 2019**. Complainant was warned that, if he failed to comply with the order by October 9, 2019, his petition for review would be dismissed.

Complainant again failed to comply with this order, as he did not file an amended petition on October 9, 2019. Rather, he stated on his amended petition's certificate of service that he mailed certified copies of his amended petition for review to the ARB and to Respondent Delta Air Lines, Inc. ("Respondent") on **October 10, 2019**—a day late. Further, the mailed copy of the amended petition for review that Respondent received on October 15, 2019 reflected an **October 11, 2019** postmark, which contradicted Complainant's statement on the certificate of service that it was mailed on October 10, 2019.

The late filing of Complainant's amended petition for review should not be excused in light of the prior warnings regarding the consequences of failing to timely file a proper petition for review. Complainant's amended petition should therefore be dismissed.

Respectfully submitted this 17th day of October, 2019.

Ellen C Ham

ELLEN C. HAM
JESSICA L. ASBRIDGE
FORD & HARRISON LLP
271 17th St., NW, Suite 1900
Atlanta, GA 30363
(404) 888-33800
Counsel for Delta Air Lines, Inc.

Director
Directorate of Whistleblower Protection Programs
US Department of Labor, OSHA
Room N 4618 FPB
200 Constitution Ave. NW
Washington, DC 20210

Via U.S. Mail

Associate Regional Solicitor
U.S. Department of Labor
300 Fifth Avenue., #1120
Seattle, WA 98107

Via U.S. Mail

Free State Reporting Inc.
1378 Cape St. Clair Road
Annapolis, MD 21407

Via U.S. Mail

Acting Regional Administrator
U.S. Department of Labor/OSHA
Region 10
300 Fifth Avenue, Ste. 1280
Seattle, WA 98104-2397

Via U.S. Mail

Ellen C Ham

ELLEN C. HAM
JESSICA L. ASBRIDGE
FORD & HARRISON LLP
271 17th St., NW, Suite 1900
Atlanta, GA 30363
(404) 888-3800
Counsel for Delta Air Lines, Inc.

WSACTIVELLP:10883987.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of October, 2019, I served a true and correct copy of the foregoing **RESPONSE TO COMPLAINANT'S AMENDED PETITION FOR REVIEW** on the following individuals/entities via FedEx overnight delivery:

Administrative Review Board
U.S. Department of Labor
Suite S-5220
200 Constitution Avenue, NW
Washington, DC 20210

I further certify that on the 17th day of October, 2019, I will serve a true and correct copy of the foregoing **RESPONSE TO COMPLAINANT'S AMENDED PETITION FOR REVIEW** on the following individuals/entities below via U.S. Mail:

The Honorable Scott R. Morris
Administrative Law Judge
Office of Administrative Law Judges
2 Executive Campus, Suite 450
Cherry Hill, NJ 08002

Via U.S. Mail

The Honorable Stephen R. Henley
Chief Administrative Law Judge
U.S. Department of Labor
Office of Administrative Law Judges
800 K Street, NW
Suite 400-North
Washington, DC 20001-8002

Via U.S. Mail

Assistant Secretary
Occupational Safety and Health
Administration
Room S-2315
200 Constitution Ave., NW
Washington, DC 20210

Via U.S. Mail

Associate Solicitor
Division of Fair Labor Standards
U.S. Department of Labor
Room N-2716, FPB
200 Constitution Ave., NW
Washington, DC 20210

Via U.S. Mail

Mr. Al J. Westrom
Whistleblower Protection Program Manager
Federal Aviation Administration
Room 911
800 Independence Ave., SW
Washington, DC 20591

Via U.S. Mail

Karl Seuring
5400 Carillon Point
Kirkland, WA 98033

Via U.S. Mail

Ius Laboris USA Global HR Lawyers
FordHarrison
271 17th Street, NW
Suite 1900
Atlanta, Georgia 30363

N METRO
GA 301
19 OCT '19
PM 8 L

U.S. POSTAGE PITNEY BOWES
ZIP 30363 $ 000.50⁰
02 4W
0000368238 OCT 18 2019

PRIVILEGED & CONFIDENTIAL

Karl Seuring
5400 Carillon Point
Kirkland, WA 98033

98033-735700

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210

**In the Matter of:**

**CARL SEURING,**

**COMPLAINANT,**

**v.**

**DELTA AIRLINES, INC,**

**RESPONDENT.**

**ARB CASE NO. 2019-0082**

**ALJ CASE NO. 2018-AIR-00033**

**DATE: October 30, 2019**

## ORDER DISMISSING COMPLAINANT'S PETITION FOR REVIEW

On August 23, 2019, an Administrative Law Judge (ALJ) denied the discrimination complaint filed by Mr. Carl Seuring (Complainant) under the provisions of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century. In the Decision and Order denying the complaint, the ALJ informed Complainant that any petition for review must specifically identify the findings, conclusions, or orders to which Complainant was objecting. On September 5, 2019, Complainant filed with the Administrative Review Board (Board) a document styled "Petition to Review" in which he asked for a 30-day extension of the time to file his actual review petition. The basis for the extension request was that Complainant was seeking new counsel for his appeal. Complainant did not specifically identify the findings, conclusions, or orders to which Complainant was objecting in this document. Over objection by Respondent, the Board granted Complainant's extension request and directed Complainant to file a petition for review that complied with 29 C.F.R. § 1979.110(a) no later than October 9, 2019. In granting the extension, the Board warned Complainant that if he failed to comply with the Board's Order by the date specified, the Board would dismiss his petition for review. Complainant did not comply with the order of the Board, although he did mail a document styled "Amended Petition for Review" on or after October 10, 2019, the

day after the specified deadline. On October 17, 2019, Respondent requested that Complainant's petition for review be dismissed as untimely, especially in light of the prior warnings regarding the consequences of untimely filing.

The Board is not insensitive to the fact that Complainant is self-represented and is seeking counsel. However, the Board previously warned Complainant of the consequences of untimely filing, and Complainant has offered no explanation for the tardy submission other than his ongoing search for representation. Moreover, in the cover letter accompanying his Amended Petition for Review dated October 10, 2019, Complainant asserted that he was "close to retaining counsel but will not be able to do so until early next week." Eighteen days have elapsed since that assertion without the filing of any notice of appearance by counsel for Complainant or further explanation as to the status of the search for representation. Under these circumstances, further delay is not in the interests of justice.

Accordingly, the Board declines to accept Complainant's Amended Petition for Review as it was untimely filed, and his original Petition for Review is hereby **DENIED** for non-compliance with 29 C.F.R. § 1979.110(a) as noted above. As such, the decision of the ALJ denying the complaint in this matter is the final order of the Secretary of Labor.

**FOR THE ADMINISTRATIVE REVIEW BOARD**:

**William T. Barto**
**Chief Administrative Appeals Judge**

Note: Questions regarding any case pending before the Board should be directed to the Board's staff: Telephone: (202) 693-6200; Facsimile: (202) 693-6220.